DANIEL S. FLOYD, SBN 123819
DFloyd@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

Attorneys for Plaintiffs and
Counterdefendants

CRAIG N. HENTSCHEL, SBN: 66178
Email: chentschel@dykema.com
DYKEMA GOSSETT LLP
333 South Grand Avenue, Suite 2100
Los Angeles, California 90071
Telephone:   (213) 457-1800
Facsimile:    (213) 457-1850

BRADFORD J. BADKE (*Pro Hac Vice*)
Email: jim.badke@ropesgray.com
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone:  (212) 596-9000
Facsimile:  (212) 596-9090

Attorneys for Defendants and Counterclaimants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| MEDTRONIC MINIMED, INC., a Delaware corporation, and MINIMED DISTRIBUTION CORPORATION, a Delaware corporation,<br><br>Plaintiffs and Counterdefendants,<br><br>v.<br><br>NOVA BIOMEDICAL CORPORATION, a Massachusetts corporation; DEGC ENTERPRISES (U.S.), INC. d/b/a CCS MEDICAL, a Florida corporation; SANVITA, INC., a Florida corporation; and DOES 1 to 10, inclusive,<br><br>Defendants and Counterclaimants. | CASE NO. CV08-00788 SJO (PJWx)<br><br>**SECOND AMENDED FINAL PRETRIAL CONFERENCE ORDER**<br><br><br>The Honorable S. James Otero<br><br><br>Pretrial Conference:  August 24, 2009<br>Time:                          9:00 a.m.<br>Trial Date:                 August 25, 2009 |

# TABLE OF CONTENTS

Page

1.  PARTIES ........................................................................................................ 1

2.  JURISDICTION AND VENUE .................................................................... 2

3.  ESTIMATED TIME NEEDED FOR TRIAL ............................................... 3

4.  TYPE OF TRIAL ......................................................................................... 3

5.  ADMITTED FACTS .................................................................................... 7

6.  STIPULATED FACTS SUBJECT TO OBJECTIONS ............................... 10

7.  CLAIMS AND DEFENSES ........................................................................ 13

8.  ISSUES THAT REMAIN TO BE TRIED .................................................. 46

9.  DISCOVERY ............................................................................................... 52

10. EXHIBITS .................................................................................................... 53

11. WITNESSES ................................................................................................ 53

12. MOTIONS .................................................................................................... 59

13. BIFURCATION ............................................................................................ 60

14. CONCLUSION ............................................................................................. 62

i

Following pretrial proceedings, pursuant to Rule 16, F.R.Civ.P. and L.R. 16, IT IS ORDERED:

1.    **PARTIES**

The parties are:

- Plaintiff Medtronic MiniMed, Inc. ("MiniMed"), a corporation organized under the laws of Delaware.
- Defendant Nova Biomedical Corporation ("Nova"), a corporation organized under the laws of Massachusetts.

On July 9, 2009, Defendants DEGC Enterprises (U.S.), Inc. d/b/a CCS Medical ("CCS") and Sanvita, Inc. ("Sanvita") filed a Notice of Filing of Bankruptcy, informing the Court that they filed for Chapter 11 bankruptcy on July 8, 2009.  (D.I. 435.)  On July 10, the Court issued a minute order staying the case as to Defendants CCS and Sanvita.  (D.I. 439.)  On July 17, 2009, the Court severed the claims brought by and against CCS and Sanvita, and ordered that the claims brought by and against Nova proceed to trial on August 18, 2009.  (D.I. 473.)  This Final Pretrial Conference Order addresses only those claims asserted by and against Nova, which are proceeding to trial.

Each of the above parties has been served and has appeared.  All other parties named in the pleadings and not identified in the preceding paragraphs are now dismissed.

The pleadings which raise the issues are:

- Plaintiffs' Second Amended Complaint, filed on April 7, 2008 [D.I. 75];
- Defendants' Amended Answer and Counterclaims to Plaintiffs' Second Amended Complaint, filed on July 28, 2008 [D.I. 122];
- Plaintiffs' Answer to Defendants' Counterclaims, filed on October 1, 2008 [D.I. 138];

- Plaintiff Medtronic MiniMed., Inc.'s Amended Memorandum of Contentions of Fact and Law, filed on July 27, 2008 [D.I. 488]; and
- Defendant Nova Biomedical Corporation's Amended Memorandum of Contentions of Fact and Law, filed on July 27, 2008 [D.I. 485].

The following claims and defenses have been abandoned:

MiniMed has abandoned the following claims and defenses:

- Second Cause of Action for Statutory Unfair Competition, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;
- Seventh Cause of Action for Trademark Infringement, Lanham Act, 15 U.S.C. § 1114(1)(a), 15 U.S.C. § 1125(a), only as to Nova;
- Eighth Cause of Action for False Association or Sponsorship and False Advertising, 15 U.S.C. § 1125(a), only as to Nova;
- Eighth Separate and Additional Defense of Offset; and
- Tenth Separate and Additional Defense of Constitutional Defect.

Nova has abandoned the following defenses:

- Second Affirmative Defense of Acquiescence; and
- Fourth Affirmative Defense of Fair Use.

In addition, MiniMed Distribution Corporation has abandoned all of its claims and defenses against Nova, and Nova has abandoned its counterclaim and defenses against MiniMed Distribution Corporation.

## 2.    <u>JURISDICTION AND VENUE</u>

Federal jurisdiction and venue are invoked upon the following grounds:

This Court has subject matter jurisdiction over MiniMed's claims under 28 U.S.C. § 1332. The following jurisdictional facts have been admitted: Plaintiff MiniMed is a corporation organized under the laws of Delaware, with its principal place of business in Northridge, California. Defendant Nova is a corporation organized under the laws of Massachusetts, with its principal place of business in

2

Waltham, Massachusetts.[1]  The amount in controversy exceeds $75,000, exclusive of interests and costs.  This Court has subject matter jurisdiction over Nova's counterclaim under 28 U.S.C. §§ 1332 and 1367(a).

Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (b)(1).  The following facts have been admitted:  A substantial part of the events giving rise to MiniMed's claims asserted occurred in this District.  Furthermore, Nova is subject to personal jurisdiction in this District and therefore "resides" in this District as that term is defined in 28 U.S.C. § 1391(c).

## 3.  ESTIMATED TIME NEEDED FOR TRIAL

The Court has ordered that each side will have 14 hours, which shall include trial of the equitable claims and defenses, but shall exclude jury selection and opening and closing statements.  Upon good cause shown, the Court may exercise its discretion to increase the number of hours allotted for trial.

## 4.  TYPE OF TRIAL

The parties have demanded a jury trial on all issues triable by jury.  The parties agree that the granting of equitable relief is an issue for the Court.  At the Pretrial Conference held on August 10, 2009, the Court severed Nova's UCL counterclaim from MiniMed's claims, and ruled that Nova's UCL counterclaim shall be tried to the Court without an advisory jury.

### MiniMed's Contentions:

Nova asserts one affirmative defense—the defense of unclean hands.  Unclean hands is an equitable defense.  *See Piscioneri v. City of Ontario*, 95 Cal. App. 4th 1037, 1053 (2002); *see also Wyler Summit Partnership v. Turner Broad. Sys*., 235 F.3d 1184,

---

[1] Defendants CCS and Sanvita are corporations organized under the laws of Florida, with their principal place of business in Clearwater, Florida.

3

1193-95 (9th Cir. 2000) (an equitable defense is not available as a defense to a legal claim). Nova's equitable defense of unclean hands must ultimately be decided by the Court. *See A-C Co. v. Security Pac. Nat'l Bank*, 173 Cal. App. 3d 462, 474 (1985) ("It is equally beyond dispute that while a jury may be used for advisory verdicts as to questions of fact, it is the duty of the trial court to make its own independent findings and to adopt or reject the findings of the jury as it deems proper. There is no authority for asking a jury's advice as to . . . whether the equitable doctrines of promissory estoppel or unclean hands should be applied." (citation omitted)); *see also McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*, 2006 WL 1652518, at *1 (E.D. Cal. June 13, 2006) (bifurcating trial into phases: a bench trial on defendant's affirmative defense of inequitable conduct, and then a jury trial on the plaintiff's infringement claim in which the court would concurrently decide the defendant's other equitable defenses of equitable estoppel and unclean hands).

At the Pretrial Conference, this Court held that, contrary to Nova's contention in the initial [Proposed] Pretrial Conference Order, Nova was not entitled to a jury trial on its UCL counterclaim, and ordered that the UCL counterclaim be tried to the Court without an advisory jury. Nova now contends that the evidence relating to its UCL counterclaim—*i.e.*, "MiniMed's marketing of the OneTouch® UltraLink™ meter" and "alleged attempts to force Nova out of the communicating meter market"—are relevant to its unclean hands defense and should be presented to the jury. Nova's attempt to shoehorn its counterclaim into its unclean hands defense should be rejected. For the unclean hands defense to apply, the alleged inequitable act must be directly related to the transactions giving rise to the plaintiff's claims.[2] The OneTouch® UltraLink™

---

[2] *See Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989) ("'It is fundamental to [the] operation of the doctrine that the alleged misconduct by the plaintiff relate directly to the transaction concerning which the complaint is made." (quoting *Arthur v. Davis*, 126 Cal. App. 3d 684, 693-94 (1981)); *Bret Harte Inn, Inc. v. San Francisco*, 16 Cal. 3d 14, 28 (1976) ("'It is not every wrongful act,
[Footnote continued on next page]

1   meter was launched *after* Nova's unauthorized use of MiniMed's trade secrets and
2   confidential information.  Thus, even accepting Nova's allegations relating to
3   MiniMed's advertising and marketing of the OneTouch® UltraLink™ meter, such
4   allegations would not show that MiniMed dirtied its hands in acquiring the rights
5   asserted in its claims and would not show that Nova's ***earlier*** misappropriation was
6   somehow innocent or justified.  Nor is such evidence relevant to Nova's rebuttal of
7   MiniMed's calculation of ***Nova's*** unjust profits from the distribution and sale of the
8   Nova Max Link™ and strips.

9        Nova also repeats its assertion made in its Motion *in Limine* No. 12 that
10  MiniMed allegedly withheld a patent application.  Not only is that patent application
11  publicly available, MiniMed produced it months ago.  Nova was obviously aware of
12  this application and related cover letter, as it placed these documents on its trial exhibit
13  list filed on July 6, 2009.  MiniMed also submitted the produced patent application and
14  cover letter to the Court on August 10, 2009 (*see* D.I. 515).  Nova's accusation is
15  completely baseless.  Moreover, Nova never requested that MiniMed produce patent
16  applications and never raised the issue during the discovery period.  Nova should not
17  be permitted to raise discovery disputes in front of the jury, which Nova neglected to
18  raise at a time when they could have been resolved.  *See Lemon v. Harlem*
19  *Globetrotters Int'l, Inc.*, 2006 WL 3524379, at *1-2 (D. Ariz. Dec. 6, 2006); *cf.*
20  *Patelco Credit Union v. Sahni*, 262 F.3d 897, 913 (9th Cir. 2001).

21
22
    _____
23  [Footnote continued from previous page]
24      nor even every fraud, which prevents a suitor in equity from obtaining relief.  His
        misconduct must be so intimately connected to the injury of another with the matter
25      for which he seeks relief, as to make it inequitable to accord him such relief.'"); *see*
        *also Rep. Molding Corp. v. B. W. Photo Utilities*, 319 F.2d 347, 350 (9th Cir. 1963)
26      ("What is material is not that the plaintiff's hands are dirty, but that he dirtied them
27      in acquiring the right he now asserts, or that the manner of dirtying renders
28      inequitable the assertion of such rights against the defendant.").

In the interest in judicial economy, and to avoid undue prejudice and confusion of the issues, the equitable issues should be bifurcated from the legal issues and tried to the Court.  MiniMed respectfully requests that this Court rule on the proper scope of Nova's unclean hands defense before the jury trial.

**Nova's Contentions:**

Nova's affirmative defense of unclean hands is not limited to actions at equity; it also applies to actions at law.  *Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612, 619-20 (Cal. Ct. App. 1992) (holding that unclean hands is an affirmative defense in legal actions); *Fireboard Paper Prods. Corp. v. East Bay Union of Machinists, Local 1304, United Steelworkers of Am., AFL-CIO*, 227 Cal. App. 2d 675, 728 (Cal. Dist. Ct. App. 1964) ("We are satisfied that the equitable defense of unclean hands is available in this state as a defense to a legal action.").  Therefore, the affirmative defense of unclean hands should be decided by the jury because the jury will decide Medtronic's legal claim to which it applies.  *See, e.g.*, *In re Circuit Breakers Litig.*, 860 F. Supp. 1453(C.D. Cal. 1994) (denying permanent injunction where jury found for defendant on its affirmative defense of unclean hands); *Unilogic*, 10 Cal. App. 4th at 622-23 (holding that trial court did not err in submitting unclean hands defense to the jury; "[T]he trial court has discretion whether to submit an equitable defense to the jury.").

There is substantial overlap between the evidence supporting Nova's unclean hands affirmative defense and Nova's other defenses to MiniMed's claims and damages case.  For example, in defending against MiniMed's misappropriation of trade secrets claim, Nova will show that MiniMed has no protectable trade secrets because MiniMed has filed and continues to file patent applications, which have been published for the whole world to see, and which disclose everything MiniMed now claims is a trade secret.  This exact same evidence also supports Nova's unclean hands affirmative defense; it shows that MiniMed did not bring this case in good faith, or after an adequate pre-suit investigation, because MiniMed has sought to patent the very thing it claims as a trade secret.  Furthermore, the fact that MiniMed withheld these patent applications during discovery, and continues to file patent applications directed

6

toward a communicating meter during the pendency of this litigation but does not produce the application, also supports Nova's unclean hands affirmative defense.  In addition, Nova's unclean hands affirmative defense is based on MiniMed's marketing of the OneTouch® UltraLink™ meter and attempts to force Nova out of the communicating meter market.  This same evidence is relevant to Nova's intent in launching the Nova Max® Link™ meter, which MiniMed has put at issue by way of its claims of willful misappropriation and intentional interference.  Contrary to MiniMed's assertions, Nova did not willfully misappropriate any trade secrets, or intend to interfere in MiniMed's economic relations; rather, the evidence will show that Nova intended to protect itself and its business in the face of MiniMed's false and misleading advertising campaign, and threats to put Nova out of business.  Finally, this same marketing evidence will also be used in Nova's rebuttal of MiniMed's damages expert's unjust enrichment opinions, in which he assumed that the OneTouch® UltraLink™ had no impact on the base of Nova Max® Link™ users, despite all of MiniMed's false and misleading statements about the Nova Max® Link™ users.  Given the significant overlap between the evidence relevant to MiniMed's claims and Nova's counterclaim and affirmative defense, judicial economy and fairness support trying Nova's affirmative defense to the jury.

5.    **ADMITTED FACTS**

The following facts are admitted and require no proof:

**Parties and Non-Parties**

(1)    Plaintiff Medtronic MiniMed, Inc. ("MiniMed") is a corporation whose principal place of business is in Northridge, California.  MiniMed focuses on medical solutions pertaining to diabetes, including insulin pump therapy and continuous glucose monitoring systems.

(2)    Defendant Nova Biomedical Corporation ("Nova") is a corporation whose principal place of business is in Waltham, Massachusetts.  Nova manufactures and supplies medical devices and diagnostic equipment,

including the Nova Max Link™ blood glucose meter.  [Amended Answer, ¶ 6.]

(3)    DEGC Enterprises (U.S.), Inc. d/b/a CCS Medical, or "CCS," is a corporation whose principal place of business is in Clearwater, Florida. CCS is a direct-to-consumer medical and pharmacy supply company that delivers and distributes products and services to people with select chronic medical conditions, including diabetes.  CCS is not a party to this trial.  [Amended Answer, ¶ 7.]

(4)    Sanvita, Inc. ("Sanvita") is a corporation whose principal place of business is in Clearwater, Florida.  Sanvita is a business-to-business distributor of products and supplies related to the treatment of diabetes, and is the exclusive distributor of the Nova Max Link™ blood glucose meter.  Sanvita is not a party to this trial.  [Amended Answer, ¶ 8.]

**Paradigm Link®**

(5)    A blood glucose meter is a medical device designed to measure, analyze, and display blood glucose levels.  [Amended Answer, ¶ 13.]

(6)    The Paradigm Link® is a blood glucose meter that was launched in July 2003, and it uses radio frequency ("RF") technology to wirelessly communicate with certain insulin pumps made by MiniMed, including MiniMed's Paradigm® pumps.  [Amended Answer, ¶ 14.]

(7)    The Paradigm Link® meter was intended for use by consumers with Type I diabetes to measure and analyze discrete blood samples and transmit blood glucose results to MiniMed insulin pumps.  These wirelessly transmitted blood glucose results are then utilized by the insulin pump's patented Bolus Wizard® calculator.  [Amended Answer, ¶ 39.]

(8)    Prior to the introduction of the Paradigm Link® meter, consumers obtained their current blood glucose value from any blood glucose meter, and then manually input that value into the insulin pump's Bolus Wizard® calculator.  This prior method exposed the risk of manually entering the *wrong* blood glucose value in the Bolus Wizard® calculator. When the Paradigm Link® meter was introduced, the risk of entering the *wrong* blood glucose value was eliminated since the data was now directly sent to the pump for use in the Bolus Wizard® calculator. [Amended Answer, ¶ 41.]

(9)     Kevin J. Seifert, then the Vice President and General Manager of Becton & Dickinson ("BD") Consumer Health Care, signed the MiniMed/BD Research and Development Agreement on behalf of BD.  Kevin J. Seifert served as the President of Nova until shortly before the filing of this action in February 2008.  [Amended Answer, ¶ 6.]

(10)    MiniMed and Nova entered into a Mutual Non-Disclosure Agreement.  The Mutual Non-Disclosure Agreement is a binding and legally enforceable contract entered into by and among MiniMed and Nova.  [Amended Answer, ¶¶ 33, 15.]

(11)    Between September 2002 and July 2003, MiniMed, Nova, and BD had regular meetings regarding the Paradigm Link® meter (also known as Project Crusader).  [Amended Answer, ¶ 36.]

(12)    MiniMed provided the following documents to Nova, each of which was stamped "CONFIDENTIAL:  Medtronic MiniMed Proprietary":  (1) "Pump/Crusader RF Interface Specification," dated October 8, 2002; (2) "RF Communication Specification Between a Crusader Meter, External Pumps, and a PC, Revision 0.1," dated November 6, 2002; and (3) "RF Communication Specification Between a Crusader Meter, External Pumps, and a PC, Revision 0.2," dated November 26, 2002.  [Amended Answer, ¶ 37.]

(13)    The Paradigm Link® meter's hardware includes, among other things, an RF transceiver, a RF PIC and a microcontroller and that the Paradigm Link® meter's software includes, among other things, a RF PIC interface and high level and low level communication protocols.  [Amended Answer, ¶ 45.]

(14)    The communication protocols that enable the wireless transmission of blood glucose results require highly specific software, algorithms and commands.  The high level protocol includes commands governing the timing and duration of the RF communication.  The low level protocol details exactly what sort of information is contained in each data packet.  [Amended Answer, ¶ 48.]

(15)    The Paradigm Link® meter has a unique, six-digit, numeric serial number that is hard-coded into the meter, and is displayed on the label.  [Amended Answer, ¶ 50.]

(16)    In September 2006, BD announced that it was exiting from the blood glucose monitoring market.  On December 11, 2006, BD and Sanvita

9

entered into an asset sale agreement whereby Sanvita purchased certain blood glucose monitoring assets from BD.  [Amended Answer, ¶ 61.]

**Nova Max Link™**

(17)  The Nova Max Link™ utilizes the same communication protocols as the Paradigm Link® meter.  [Amended Answer, ¶ 76.]

(18)  The Nova Max Link™ utilizes the same serial numbering scheme as the Paradigm Link® meter.  [Amended Answer, ¶ 77.]

## 6.    STIPULATED FACTS SUBJECT TO OBJECTIONS

The following facts, though stipulated, shall be without prejudice to any evidentiary objection[3]:

**Paradigm Link®**

(1)  An insulin pump is a medical device designed to deliver insulin continuously to the body.

(2)  MiniMed manufactures and distributes a line of insulin pumps under the Paradigm® brand name.

(3)  In 2001, MiniMed and BD entered into business discussions regarding a potential partnership to develop and distribute a blood glucose meter that communicated wirelessly with MiniMed's Paradigm® insulin pumps.

(4)  MiniMed and BD entered into a Confidential Disclosure Agreement, effective October 1, 2001.  The Confidential Disclosure Agreement is a legally valid and enforceable contract.

---

[3] Unless expressly stated otherwise, the stipulated facts set forth herein are without prejudice to any evidentiary objections and/or motion by any party to this action. The parties recognize that various sources exist for certain of the categories of facts set forth herein.  These Stipulated Facts do not preclude the experts for the parties at trial from relying on facts that are different from the Stipulated Facts.

(5)    On September 24, 2002, MiniMed and BD executed the First Amendment to the October 1, 2001 Confidential Disclosure Agreement. The First Amendment is a legally valid and enforceable contract.

(6)    BD had a manufacturing and distribution agreement ("Manufacturing Agreement") with Nova, dated as of September 14, 2000. The BD/Nova Manufacturing Agreement is a legally valid and enforceable contract.

(7)    Nova manufactured the BD Logic™ meter. The BD Logic™ meter did not have the capability of wirelessly communicating with MiniMed's Paradigm® insulin pumps.

(8)    On December 14, 2002, BD and Nova entered into a Research and Development Agreement. The BD/Nova Research and Development Agreement is a legally valid and enforceable contract.

(9)    On December 14, 2002, BD and Nova amended their existing Manufacturing Agreement. The Amendment to the BD/Nova Manufacturing Agreement is a legally valid and enforceable contract.

(10)    On December 21, 2002, MiniMed entered into a Research and Development Agreement with BD. The MiniMed/BD Research and Development Agreement is a legally valid and enforceable contract.

(11)    On December 21, 2002, MiniMed entered into a Distribution and Collaboration Agreement with BD. The MiniMed/BD Distribution and Collaboration Agreement is a legally valid and enforceable contract.

(12)    MiniMed, Nova, and BD met at MiniMed's headquarters on September 24, 2002 to discuss the Crusader meter development project.

(13)    The communicating meter codenamed Crusader was ultimately marketed as the Paradigm Link®.

(14)    On or about June 17, 2003, MiniMed obtained the 510(k) clearance for the Paradigm Link® meter along with its Paradigm® Model 512 pump (K030531).

(15)    On or about May 19, 2004, BD obtained a 510(k) clearance for the Paradigm Link® meter (K040603).

(16)    The Paradigm Link® meter was manufactured by Nova for BD.

11

(17)  The Paradigm Link® blood glucose meter was marketed as a co-branded MiniMed/BD product.

(18)  MiniMed was the exclusive distributor of the Paradigm Link® meter.

(19)  Blood glucose meters use unique test strips that are not interchangeable between meter brands.

(20)  From the time of its launch to 2007, the Paradigm Link® meter used BD™ test strips.  The BD™ test strips were developed and manufactured by Nova.

(21)  The BD™ test strips were rebranded as Nova Max® test strips in 2007.

**BD's Exit from Blood Glucose Monitoring Market**

(22)  Sanvita entered into a Purchase Agreement and related agreements with BD on December 11, 2006.  The BD/Sanvita Purchase Agreement and related agreements are legally valid and enforceable contracts.

(23)  BD and Nova entered into a Termination Agreement on December 11, 2006.  The BD/Nova Termination Agreement is a legally valid and enforceable contract.

(24)  MiniMed and BD executed a Termination Agreement effective March 22, 2007.  The MiniMed/BD Termination Agreement is a legally valid and enforceable contract.

**Nova Max Link™**

(25)  Nova is the manufacturer of the Nova Max Link™ meter, which is distributed by Sanvita.  The Nova Max Link™ meter uses Nova Max® test strips, which are also manufactured by Nova and distributed by Sanvita.

(26)  The Nova Max Link™ meter uses the same wireless communication technology as the Paradigm Link® meter.

(27)  Nova manufactures the rebranded version of the BD Logic™ meter, called the Nova Max® meter, which does not have the capability of wirelessly communicating with MiniMed's Paradigm® insulin pumps.  The Nova Max® meter was publicly launched in 2007.

**OneTouch® UltraLink™ Meter**

(28)  In August 2007, MiniMed entered into exclusive agreements with LifeScan, Inc. ("LifeScan") to develop and distribute a communicating blood glucose meter in the United States.

(29)  MiniMed issued a press release announcing its exclusive alliance with LifeScan on August 21, 2007.

(30)  The OneTouch® UltraLink™ meter is the name of the blood glucose meter co-developed by MiniMed and LifeScan, which wirelessly communicates with MiniMed's Paradigm® insulin pumps.

(31)  The OneTouch® UltraLink™ was publicly launched in April 2008.

(32)  The OneTouch® UltraLink™ meter uses OneTouch® test strips manufactured by LifeScan.  OneTouch® test strips are not interchangeable with Nova Max® test strips.

## 7.  CLAIMS AND DEFENSES

### PLAINTIFF'S CLAIMS AND AFFIRMATIVE DEFENSE

**(a)  MiniMed plans to pursue the following claims and affirmative defense against Nova:**

Claim 1:  Nova misappropriated MiniMed's trade secrets, in violation of the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code §§ 3426, *et seq*.

Claim 2:  Nova wrongfully converted MiniMed's property to its own use.

Claim 3:  Nova breached its Mutual Non-Disclosure Agreement with MiniMed, dated September 27, 2002.

Claim 4:  Nova intentionally interfered with MiniMed's prospective economic advantage.

Affirmative Defense 1:  Nova's counterclaim for unfair or fraudulent business practices under the UCL is barred by the doctrine of unclean hands.[4]

---

[4]  MiniMed is pursuing its Fourth Separate and Additional Defense of No Basis for Restitution and Disgorgement, and Ninth Separate and Additional Defense of Unjust Enrichment to Nova's Counterclaim for Unfair Competition Under the

[Footnote continued on next page]

13

**(b)** **The elements required to establish Plaintiff's claims and affirmative defense are:**

    **i.** **Claim 1:  Misappropriation of Trade Secrets**

The elements of MiniMed's cause of action for misappropriation of trade secrets under the California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426, *et seq.*, are:

    (1)    MiniMed owned the Communication Technology, which consists of software specifications (including algorithms, arrangement, and unpublished source code and high-level and low-level communication protocols), hardware performance requirements, the combination of software and hardware components, know-how, methods, and processes to enable wireless radio frequency communication with MiniMed's insulin pumps;

    (2)    The Communication Technology was a trade secret at the time of the misappropriation;

    (3)    Nova improperly used the Communication Technology;

    (4)    MiniMed was harmed or Nova was unjustly enriched; and

    (5)    Nova's use of the Communication Technology was a substantial factor in causing MiniMed's harm or Nova to be unjustly enriched.

Judicial Council Of California Civil Jury Instructions (2008) ("CACI") No. 4401.

To establish the second element above, MiniMed must show that a trade secret is "information, including a formula, pattern, compilation, program, device, method, technique, or process, that:  (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that

---

[Footnote continued from previous page]
    California Business & Professional Code, § 17200 *et seq.*  However, MiniMed does not bear the burden of proof on these defenses.

are reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).

To establish the third element above, MiniMed must show that Nova used the Communication Technology without MiniMed's consent and, at the time of use, knew or had reason to know that the Communication Technology was either (i) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (ii) derived from or through a third party owing a duty to MiniMed to maintain its secrecy or limit its use.  *See* Cal. Civ. Code § 3426.1(b)(2); CACI No. 4407.

**Nova's Contentions:**

To establish the first, second, and third elements above, MiniMed must identify with specificity what it alleged are the trade secrets at issue.  *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 523 (9th Cir. 1993) ("Since the trade secrets are not specifically identified, we cannot determine whether Peak has misappropriated any trade secrets . . ."); *Veteran Med. Prods., Inc. v. Bionix Dev. Corp.*, 2008 U.S. Dist LEXIS 19468, at *32 (W.D. Mich. Mar. 13, 2008) ("By failing to identify the technical trade secrets at issue, [the trade secret plaintiff] cannot meet its burden of proving either the existence of the trade secrets or that it took reasonable efforts to protect them.").  *See also Religious Tech. Center v. Netcom On-Line Communications Servs., Inc.*, 923 F. Supp. 1231, 1252 (N.D. Cal. 1995) (stating that a vague "definition is problematic because it is impossible to determine when the 'secret' has been lost after portions of the work have been disclosed").

**MiniMed's Contentions:**

It is now up to the jury to determine whether the Communication Technology qualifies as a trade secret and whether it was misappropriated.  *See Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1453 (2002) ("The ultimate determination of trade secret status is subject to proof presented at trial.").

        **ii.    Claim 2:  Conversion**

**MiniMed's Contentions:**

15

MiniMed's cause of action for conversion under California law has the following elements:

(1)    MiniMed owned, possessed, or had a right to possession of information contained in documents and materials that MiniMed provided to Nova for the sole purpose of manufacturing the Paradigm Link®;

(2)    Nova intentionally took possession of that property by a wrongful act;

(3)    MiniMed did not consent;

(4)    MiniMed was harmed; and

(5)    Nova's conduct was a substantial factor in causing MiniMed's harm.

*See Kremen v. Cohen*, 337 F.3d 1024, 1029-30 (9th Cir. 2003); *G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 906-07 (9th Cir. 1992); *see also Spates v. Dameron Hosp. Ass'n*, 114 Cal. App. 4th 208, 221 (2003).

"The Ninth Circuit has explicitly held that conversion claims under California law apply to intangible property."  Order Denying Defs.' Mot. for Partial Summary Judgment ("May 22, 2009 Order") [D.I. 324] at 13 (citing *Kremen*, 337 F.3d at 1030-31).  The tort "'at most requires only *some* connection to a document or tangible object.'"  *Id.* (quoting *Kremen*, 337 F.3d at 1033).  To establish conversion, "[i]t is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, or that the alleged converter has applied the property to his own use.'"  May 22, 2009 Order [D.I. 324] at 13 (quoting *Spates*, 114 Cal. App. 4th at 221).  A conversion claim may lie even if the defendant only obtained copies of the documents reflecting the intangible property.  *See G.S. Rasmussen*, 958 F.2d at 899-900, 908 (holding that the plaintiff had stated a valid claim for conversion and unjust enrichment where the defendant "copied the supplemental flight manual from a Rasmussen STC-equipped DC-8 it already owned, and obtained the three necessary instruments from sources other than Rasmussen," and in its FAA for an airworthiness certificate, "typed the number of Rasmussen's STC on the appropriate line of the application, and included a photocopy of the certificate

itself"); *Kremen*, 337 F.3d at 1032-33 (noting that in *A&M Records, Inc. v. Heilman*, 75 Cal. App. 3d 554 (1977), the court "applied the tort to a defendant who sold bootlegged copies of musical recordings" and the Ninth Circuit has "applied *A & M Records* to intellectual property rights in an audio broadcast and to a regulatory filing" (citing *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 725 (9th Cir. 1984), and *G.S. Rasmussen*, 958 F.2d at 906-07); *see also Ali v. Fasteners for Retail, Inc.*, 544 F. Supp. 2d 1064, 1072 (E.D. Cal. 2008) (finding that the plaintiff's "source codes, cost data, and part numbers" was property capable of being converted under California law, which was allegedly converted when the defendants interpreted plaintiff's emails containing the information, and copied proprietary source code by burning a copy onto a CD or DVD-ROM).

**Nova's Contentions:**

MiniMed's cause of action for conversion under California law has the following elements:

    (1)    MiniMed owned the alleged trade secret communication technology;

    (2)    Nova intentionally took possession of that property by a wrongful act;

    (3)    MiniMed did not consent;

    (4)    MiniMed was harmed; and

    (5)    Nova's conduct was a substantial factor in causing MiniMed's harm.

*See* CACI No. 2100.

To establish that the alleged trade secret communication technology is property that is capable of being converted, Medtronic must show that (1) Medtronic has an interest capable of precise definition, (2) the property is capable of exclusive possession or control, and (3) Medtronic has a legitimate claim to exclusivity. *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003). Furthermore, with respect to the second element, "the possession of copies of documents – as opposed to the documents themselves – does not amount to an interference with the owner's property sufficient to constitute conversion." *FMC Corp. v. Capital Cities/ABC, Inc.*, 915 F.2d 300, 303

(7th Cir. 1990) (applying California law); *see also VSS Emultech v. Crenshaw*, No. C049676, 2006 WL 2411454, at *8 (Cal. Ct. App. Aug. 22, 2006).

### iii.    Claim 3:  Breach of Contract

The elements of MiniMed's cause of action against Nova for breach of contract under California law are:

(1)    MiniMed and Nova entered into the Mutual Non-Disclosure Agreement, dated September 27, 2002;

(2)    MiniMed did all, or substantially all, of the significant things that the contract required MiniMed to do, or MiniMed was excused from doing those things;

(3)    Nova failed to do something that the contract required it to do, or did something that the contract prohibited it from doing; and

(4)    MiniMed was harmed by that failure.

*See* CACI No. 303.

**MiniMed's Contentions:**

MiniMed contends that the fourth element above should read: "(4) MiniMed was harmed by that failure or Nova was unjustly enriched by its breach."  MiniMed is entitled to disgorgement of Nova's unjust enrichment for breach of the Mutual Non-Disclosure Agreement.  *See Ajaxo Inc. v. E*Trade Group, Inc.*, 135 Cal. App. 4th 21, 57 (2005) (holding, in case involving a breach of a nondisclosure agreement, that the plaintiff "must be 'compensated' for [the defendant's] breach of the NDA, i.e. by [defendant] disgorging its unjust enrichment"); *see also Foster Poultry Farms, Inc. v. Suntrust Bank*, 2008 WL 160960, at *49 (E.D. Cal. Jan. 14, 2008) ("Under California law, disgorgement of improperly obtained profits is a remedy for breach of a contract protecting trade secrets and proprietary confidential information.").

18

### iv.    Claim 4:  Intentional Interference with Prospective Economic Advantage

MiniMed contends that Nova intentionally interfered with MiniMed's prospective economic advantage from its relationship with LifeScan.  The elements of this cause of action under California law are:

    (1)    MiniMed was in an economic relationship with LifeScan that probably would have resulted in an economic benefit to MiniMed;

    (2)    Nova knew of MiniMed's relationship with LifeScan;

    (3)    Nova intended to disrupt the relationship;

    (4)    Nova engaged in wrongful conduct, specifically, in addition to misappropriating MiniMed's trade secrets and using confidential information, by manufacturing and distributing Nova Max Link™ meters using serial numbers to which it had no rights;

    (5)    The relationship was actually disrupted;

    (6)    MiniMed was harmed; and

    (7)    Nova's wrongful conduct was a substantial factor in causing MiniMed's harm.

CACI No. 2202; *see Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 944 (2008).

**MiniMed's Contentions:**

For the third element above, "[i]t is not necessary to prove that the defendant acted with the specific intent, or purpose, of disrupting the plaintiff's prospective economic advantage"; rather, it is sufficient to show that the defendant "'[knew] that the interference is certain or substantially certain to occur as a result of [its] action.'" *San Jose Const., Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1544-45 (2007) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1156-57 (2003)).

**Nova's Contentions:**

19

For the fourth element above, MiniMed must prove that the alleged interference was wrongful by some legal measure independent of the interference itself. *See, e.g.*, *San Jose Const.*, 155 Cal. App. 4th at 1544 (citation omitted).

### v.    Affirmative Defense 1:  Unclean Hands

The elements required to be established for MiniMed's affirmative defense of unclean hands to Nova's UCL counterclaim are:

(1)    Nova engaged in inequitable conduct;

(2)    The conduct relates to the matter in controversy; and

(3)    It would be inequitable to grant Nova any relief.

*See Dickson, Carlson & Campillo v. Pole*, 83 Cal. App. 4th 436, 446-47 (2000).

**(c)    In brief, the key evidence Plaintiff relies on for each claim and affirmative defense is:**

### i.    Claim 1:  Misappropriation of Trade Secrets

#### (1)    MiniMed owned the Communication Technology.

The evidence presented at trial will show that MiniMed invested many years and approximately $7 million dollars to develop a robust, secure, yet low-power radio frequency communication technology for use with its insulin pumps and other medical devices.  The trade secret Communication Technology that MiniMed innovated consists of software specifications (including algorithms, arrangement, and unpublished source code and high-level and low-level communication protocols), hardware performance requirements, the selection of software and hardware components unique to, and optimal for, the Paradigm Link® meter and process.  The software component of the Communication Technology includes the interface of the RF programmable interface controller ("PIC"), a software means to control access to the RF PIC's central processing unit; and the RF specification, including high-level and low-level communication protocols and encryption source code.  The hardware component of the Communication Technology involves the selection of hardware

satisfying certain performance requirements, including the required electronic, radio transmitter, and radio receiver characteristics.

The first MiniMed products to offer RF communication functionality were MiniMed's remote key fob controllers and Model 508 Paradigm® insulin pumps, which were launched in October 1999. In 2002, MiniMed decided to adapt the Communication Technology for use in a blood glucose meter ("BGM"), a device used by many diabetics to measure their blood glucose levels. Because MiniMed was not a manufacturer of BGMs, it partnered with Becton, Dickinson & Company ("BD"), which sold a non-communicating meter called the BD Logic™ meter. The purpose of the partnership was for the companies to develop, and for MiniMed to distribute to its insulin pump customers, a BGM that could wirelessly communicate with MiniMed's pumps using MiniMed's Communication Technology. The Research and Development Agreement between MiniMed and BD made clear that MiniMed would retain exclusive ownership of its existing technology, which included the Communication Technology.

MiniMed alone was responsible for creating the Communication Technology specifications for the meter. MiniMed invested approximately $420,000 to define, validate, and finalize the specifications of the Communication Technology for use in the meter. BD brought Nova into the project (codenamed "Project Crusader") as its subcontractor or original equipment manufacturer. Nova's role was to redesign, on BD's behalf, the BD Logic™ meter circuitry according to the requirements that MiniMed developed, so that the meter could wirelessly communicate with MiniMed's insulin pump using MiniMed's Communication Technology. Nova made no changes to the Communication Technology. Consistent with its role as subcontractor, Nova received payment from BD for all the work it did in Project Crusader. The final FDA-approved product, launched in July 2003, was named the Paradigm Link® to take advantage of the brand value of MiniMed's Paradigm® line of insulin pumps.

**(2)    The Communication Technology was a trade secret at the time of the misappropriation.**

The evidence will demonstrate that MiniMed's Communication Technology has significant economic value.  MiniMed invested significant time and resources in designing each of these components to ensure that the system was reliable, safe, and consumed as little power as possible.  Although there may be several possible solutions to each, the optimal solutions were only discovered after reiterative trial and error, experimentation, and innovation by MiniMed.  The evidence will show that the specific source code, hardware characteristics, and implementation choices that MiniMed made to enable RF wireless communication with its insulin pumps were not publicly disclosed, but were maintained confidentially.

The technical specifications and know-how necessary to enable RF wireless communication with MiniMed's insulin pumps, as embodied in the Paradigm Link®, are not in the public domain and are not generally known within the industry.  When the Paradigm Link® was launched in July 2003, there was no other BGM that offered RF communication functionality.  There is also no evidence that Nova independently derived or reverse engineered the Communication Technology when it produced the Nova Max Link™ meter.  In 2007, after BD's exit from the BGM business, MiniMed entered into exclusive agreements with two major meter companies, LifeScan (in the United States) and Bayer Healthcare (outside the United States), to co-develop new communicating meters that use MiniMed's Communication Technology.  The license fees that MiniMed receives are clear proof that the Communication Technology is not generally known within the industry and has significant economic value as a result.

MiniMed took reasonable measures to protect the secrecy of the Communication Technology.  At all relevant times, MiniMed's internal policies and practices served to protect its trade secrets.  These measures included requiring its employees to sign confidentiality agreements, restricting access to detailed information regarding MiniMed's research and development efforts, securing detailing sensitive trade secret

22

1  information in a central, locked document depository, and stamping documents

2  containing trade secret information with a confidentiality legend.

3      MiniMed also took reasonable protection measures in connection with the

4  development of the Paradigm Link®.  As this Court has held, "'the mere fact that one

5  disclosed its purported trade secrets to a limited number of outsiders for a particular

6  purpose did not forfeit trade secret protection.  On the contrary, such disclosure, which

7  is often necessary to the efficient exploitation of a trade secret, imposes a duty of

8  confidentiality on the person to whom the disclosure is made.'"  May 22, 2009 Order

9  [D.I. 324] at 8-9 (quoting *Rockwell Graphic Sys., Inc. v. Dev. Indus., Inc.*, 925 F.2d

10  174, 177 (7th Cir. 1991) (internal quotation marks omitted)).  Indeed, this Court has

11  recognized that where trade secret information is provided to a subcontractor to

12  manufacture a product, and the "subcontractor knows that the product it is hired to

13  develop 'ha[s] not yet been released to the market . . . , [it] has reason to know that [the

14  company that hired it] owe[s] [the company for whom it is developing the product] a

15  duty of secrecy with regard to [the product] technology.'"  *Id.* [D.I. 324] at 8 (quoting

16  *Speech Tech. Assocs. v. Adaptive Commc'n Sys., Inc.*, 1994 U.S. Dist. LEXIS 11660,

17  at *24 (N.D. Cal. Aug. 16, 1994)).

18      The evidence will demonstrate that MiniMed disclosed its Communication

19  Technology to Nova pursuant to multiple interrelated nondisclosure, development, and

20  manufacturing agreements, each of which contained express and implied

21  confidentiality obligations and restrictions on use.  Before any disclosure to Nova,

22  MiniMed entered into a Confidential Disclosure Agreement with its partner in the

23  venture, BD.  This agreement required BD to "take the same degree of precautions in

24  accordance with procedures which it follows with respect to its own Confidential

25  Information to avoid disclosure of such information."  At that time, BD already had

26  agreements in place with Nova which prohibited Nova from disclosing or using

27  confidential information it received from BD.  In September 2002, BD asked Nova to

28  review and approve a draft amendment to this agreement to include Nova's BGM

technology under the confidentiality provisions of that agreement, which was also amended to cover MiniMed's Communication Technology. Thus, before any disclosure, Nova was aware that BD owed MiniMed a duty of confidentiality and that BD was obligated to ensure that all confidentiality and use restrictions imposed on Nova regarding BD's own confidential information likewise applied to MiniMed's confidential information.

On December 14, 2002, BD and Nova entered into a Research and Development Agreement, specifically to cover the co-development of BD/MiniMed products. The Research and Development Agreement between BD and Nova expressly included MiniMed's trade secrets within the definition of "BD Technology," which was defined to include "IP of third parties, including . . . Medtronic MiniMed, Inc." This agreement also provided that "Program Rights that cover or are based on or derived from any third party IP within BD Technology . . . shall be owned by BD." Finally, this agreement bound both BD and Nova to strict confidentiality obligations regarding any Confidential Information disclosed by the other party, and provided that a party receiving Confidential Information was prohibited from using it outside of the BD/Nova relationship.

Also on December 14, 2002, BD and Nova amended their existing Manufacturing Agreement to cover the BD/MiniMed products. The Manufacturing Agreement defined "BD Know-How" as "any technical knowledge, information and materials . . . owned or otherwise *controlled* by BD." "BD Know-How," which incorporated MiniMed's Communication Technology by operation of this provision and the definition of "BD Technology" in the Research and Development Agreement, was included in the definition of "Confidential Information" under the Manufacturing Agreement. The nondisclosure provision in this agreement prohibited Nova from disclosing Confidential Information or using it for any other purpose. In addition, in the event of termination, the Manufacturing Agreement required Nova to immediately cease using all Confidential Information and return it upon request. In September

2007, at MiniMed's request, BD exercised its right to require Nova to cease using and return MiniMed's confidential information.  Nova never responded.

In April 2003, Nova requested MiniMed to execute a nondisclosure agreement to cover any confidential information that it had provided to MiniMed in the course of Project Crusader.  Consistent with its general practice, MiniMed proposed that the nondisclosure agreement be mutually binding.  MiniMed will prove at trial that it agreed to the Mutual Non-Disclosure Agreement as a "belt-and-suspenders" measure to further protect its trade secrets, which MiniMed believed were sufficiently covered via its agreements with BD.

As this Court has recognized, even time-limited nondisclosure agreements can constitute reasonable measures to protect trade secrets.  May 22, 2009 Order [D.I. 324] at 9-10 (citing *Veteran Med. Prods., Inc. v. Bionix Dev. Corp.*, 2008 U.S. Dist. LEXIS 19468, at *12, 22 (W.D. Mar. 13, 2008) (holding non-disclosure agreement that expired after three years, in conjunction with a confidentiality notice in emails, constituted a reasonable effort to maintain secrecy)).  In this case, the Mutual Non-Disclosure Agreement imposed an affirmative obligation to prevent nondisclosure for five years, but permanently barred the recipient from using the disclosing party's confidential information for an unauthorized purpose.  Specifically, paragraph 5 provides:

> This Agreement shall not be construed as granting or conferring any rights, by license or otherwise, expressly, impliedly or otherwise, with respect to such Confidential Information or to any invention, discovery or improvement made, conceived or acquired prior to or after the date of this Agreement.  ***Receiving party shall not make use of the Confidential Information for its own benefit without the prior written consent of disclosing party***.

(emphasis added).  This perpetual restriction on use—which eliminated any incentive for the recipient of confidential information to disclose it—constituted a reasonable measure to protect the Communication Technology.

The evidence will further show that both parties agreed that the Mutual Non-Disclosure Agreement should be dated to cover the first disclosure of confidential information. The Mutual Non-Disclosure Agreement was dated effective as of September 27, 2002, due to a mistaken belief that the first development meeting involving MiniMed, BD, and Nova had occurred on that date. In any event, MiniMed provided Nova with detailed software and hardware specifications, which were necessary to enable the meter to wirelessly communicate with MiniMed's insulin pumps, after September 27, 2002.

These agreements individually and collectively evidence the parties' intent to maintain the secrecy of MiniMed's Communication Technology and to impose clear duties of confidentiality and restrictions on its use, upon which MiniMed could reasonably rely to protect its trade secrets.

### (3) Nova improperly used the Communication Technology.

The evidence at trial will establish that Nova used the Communication Technology in the Nova Max Link™ meter. James Sidwell, Nova's VP of Diabetes Research and Development, testified at his deposition that in 2007, Nova initially made modifications to the BD Logic™ meter to create the Nova Max® meter, and then simply extracted the RF circuitry from the Paradigm Link® and imported it into the Nova Max® platform to make the Nova Max Link™, thereby improperly using MiniMed's confidential information. Indeed, Nova has asserted in its papers to this Court that "Nova did not do any work on the Communication Technology to bring the new meter to market." Defs.' Reply in Support of Their Mot. for Partial Summary Judgment [D.I. 239] at 5.

The evidence will show that Nova knew that BD owed a duty to MiniMed to maintain the secrecy of the Communication Technology and to limit its use, and that Nova was being granted access to MiniMed's Communication Technology solely in its capacity as BD's subcontractor. Before any disclosure took place, Nova reviewed and approved the Confidential Disclosure Agreement between BD and MiniMed, and

amendment thereto.  In addition, in its agreements with BD, Nova agreed that it would not obtain any rights to the technology contributed by MiniMed or any derivative thereof, and further agreed that it would not have any rights to commercialize the developed product.

The evidence will also show that Nova acquired knowledge of MiniMed's trade secrets through circumstances giving rise to a direct obligation to MiniMed to maintain the secrecy of the Communication Technology and limit its use.  Nova received the Communication Technology in the context of a confidential business exchange, solely for the purpose of fulfilling its obligations as BD's OEM.  In addition, MiniMed's technical specifications displayed legends stating that they were MiniMed's confidential and proprietary information.  Nova fully understood that it had a duty to maintain the confidentiality of those specifications.  In fact, the head of Nova's development team expressly acknowledged to MiniMed, at the start of Project Crusader, that Nova would treat the information that MiniMed provided as MiniMed's confidential and proprietary information.

Nova further agreed, in the Mutual Non-Disclosure Agreement, that it could ***never use*** any of MiniMed's confidential information for its own purposes.  Although Nova now claims that the five-year term in the confidentiality provision permitted it to use MiniMed's Communication Technology, the evidence will show that Nova's President did not even review the Mutual Non-Disclosure Agreement until after this litigation commenced, and in any event, Nova began using the Communication Technology well before five years following disclosure.  In September 2007, at MiniMed's request, BD sent Nova a letter asking it to cease using and return MiniMed's confidential information.  Nova never responded to the letter, nor did it respond to the follow-up letter that BD sent to Nova in February 2008.

Nova may attempt to argue that it believed that Sanvita had purchased the rights to the Communication Technology from BD.  As discussed, under the Research and Development Agreement between MiniMed and BD, it was very clear that MiniMed

would retain exclusive ownership of the technology that it brought to the table, which included the Communication Technology. John Simmons, the former Vice President for Diabetes Marketing at BD, was a key negotiator of the BD/Sanvita Purchase Agreement dated December 11, 2006. Mr. Simmons will testify that Nova was involved in the early discussions with BD and Sanvita. Mr. Simmons will further testify that Sanvita initially sought to purchase the IP license involving the Paradigm Link®, but that BD made clear that the Paradigm Link® was not BD's to sell, but was a product that BD supplied under a contractual obligation to MiniMed. As BD had no rights to the Communication Technology, it could not and did not sell or license such rights to Sanvita.

In summary, the evidence will demonstrate that Nova knew that the Communication Technology was MiniMed's trade secret and that it had an obligation not to use it, yet willfully and maliciously exploited the Communication Technology to launch its own product, the Nova Max Link™.

### (4)    MiniMed was harmed or Nova was unjustly enriched.

MiniMed will show at trial that Nova was unjustly enriched by its misappropriation of MiniMed's trade secrets, in the amount of profits it earned from the distribution and sale of the Nova Max Link™ and associated test strips. This amount ranges from approximately $4.4 million to $16.9 million. In addition, Nova's misappropriation of trade secrets caused a diminution in value of MiniMed's trade secrets in the amount of approximately $2.5 million to $13.8 million.

MiniMed also seeks an injunction barring Nova, its assigns or successors from disclosing MiniMed's Communication Technology, or further using MiniMed's Communication Technology in the manufacturing, production, and sale of the Nova Max Link™ meter or any future product. And because Nova's misappropriation was willful and malicious, MiniMed should be awarded exemplary damages, attorneys' fees, and costs. *See* Cal. Civ. Code §§ 3426.2, 3626.3, 3626.4.

**(5)** **Nova's use of the Communication Technology was a substantial factor in causing MiniMed's harm or Nova to be unjustly enriched.**

It took MiniMed many years to develop, implement, and fine-tune the software and hardware specifications and particular combination of components that enabled the Paradigm Link® to be able to communicate wirelessly with MiniMed's Paradigm® insulin pumps. By misappropriating MiniMed's Communication Technology, Nova was able to skip over years of research and development, leapfrog MiniMed in the launch of a new communicating meter, and place a significant number of Nova Max Link™ meters before MiniMed could send out OneTouch® UltraLink™ meters to its installed base. Nova unjustly reaped the benefits of offering the first "replacement" for the Paradigm Link®, in the form of profits from the sale of associated test strips. The existence of another competitor utilizing the Communication Technology has reduced the value of the trade secrets and has compromised the ability of MiniMed to enter into another development and supply agreement at the end of its agreement with LifeScan.

**ii.** **Claim 2: Conversion**

**(1)** **MiniMed owned, possessed, or had a right to possession of information contained in documents and materials that MiniMed provided to Nova for the sole purpose of manufacturing the Paradigm Link®**

The evidence at trial will show that during the course of Project Crusader MiniMed provided various technical specifications to Nova, so that Nova could carry out its role as BD's subcontractor and manufacturer of the Paradigm Link® meter. For example, on November 8, 2002, MiniMed sent Nova (and BD) a document entitled "Spec, Product, Crusader Sys (ES9095)." Each page of the document was stamped "CONFIDENTIAL (prototype)." Prominently displayed on the front page was the following legend: "This document contains information which is the property of Medtronic MiniMed. This document may not, in whole or in part, be duplicated,

29

disclosed, or used for design or manufacturing purposes without the prior written permission of Medtronic MiniMed."  That same day, MiniMed sent Nova a document entitled "Preliminary RF Communication Specification Between a Crusader Meter, External Pumps, and a PC."  Each page of the document was stamped "CONFIDENTIAL:  Medtronic MiniMed Proprietary."

In addition to technical specifications, MiniMed provided other proprietary information and materials to enable Nova to build and test the Paradigm Link® meter. All of this information was covered by the Mutual Non-Disclosure Agreement, which defined "Confidential Information" as information relating to the "Subject," which was broadly defined as

> including without limitation external pump specifications, external sensor specifications, communication specifications (hardware, electronic circuits, components, trouble shooting, software, communication protocols, signal timing, frequencies, etc.), system specifications, testing protocols, test results, personnel contacts, regulatory documents, marketing information, customer service information, component and product costs, and any other information useful for co-developing a blood glucose meter that communicates with Medtronic devices and/or software.

In signing the Mutual Non-Disclosure Agreement, Nova agreed not to use MiniMed's Confidential Information for any purpose not authorized by MiniMed.  In paragraph 4, Nova further agreed:

> All documents, drawings, specifications, sketches, designs, pictures, films, tapes, and other tangible objects delivered by one party to the other party pursuant to this Agreement ***and any work product derived from them*** (if, and only to the extent that, such work product contains Confidential Information) ***shall be promptly returned to such one party upon written request, or destroyed (and certified to such party as destroyed) at such one party's option***; provided, however, that each party may retain one copy of such items for archival purposes, subject to the terms of this Agreement.

(emphases added).

30

1
2

        **(2)     Nova intentionally took possession of that property by a wrongful act.**

3
4
5
6
7

      While the Mutual Non-Disclosure Agreement permitted Nova to "retain one copy of such items *for archival purposes*," the evidence will demonstrate that Nova did not simply store these items in its archives. Rather, Nova actively used MiniMed's Confidential Information to develop, test, seek regulatory clearance for, and manufacture its own product, the Nova Max Link™ meter.

8

        **(3)     MiniMed did not consent.**

9
10
11
12
13

      Nova did not inform MiniMed that it was using, or had plans to use, MiniMed's Confidential Information to develop or produce the Nova Max Link™ meter, and MiniMed did not consent to such use. At MiniMed's request, BD sent letters to Nova in September 2007 and again in February 2008, asking that Nova return or destroy MiniMed's confidential information. Nova did not respond.

14
15

        **(4)     MiniMed was harmed, and Nova's conduct was a substantial factor in causing MiniMed's harm.**

16
17
18
19
20
21
22
23
24
25

      By surreptitiously converting MiniMed's Confidential Information, Nova avoided having to pay MiniMed any license fees. Nova also received a significant time-to-market advantage, and was also able to place a significant number of Nova Max Link™ meters in the marketplace before the launch of the OneTouch® UltraLink™ meter, and was unjustly enriched as a result. In addition, Nova's conversion caused a diminution in value of MiniMed's trade secrets in the amount of approximately $2.5 million to $13.8 million. MiniMed seeks an injunction prohibiting Nova from continuing to use MiniMed's confidential and proprietary information, and requiring Nova to return the same. Nova's conduct was malicious and fraudulent, warranting an award of punitive damages.

26
27
28

iii.    **Claim 3: Breach of Contract**

(1)    **MiniMed and Nova entered into a contract.**

Nova has admitted that MiniMed and Nova entered into a Mutual Non-Disclosure Agreement dated effective as of September 27, 2002, and that the Mutual Non-Disclosure Agreement is a legally enforceable contract entered into by and between MiniMed and Nova.

(2)    **MiniMed did all, or substantially all, of the significant things that the contract required MiniMed to do, or MiniMed was excused from doing those things.**

The Mutual Non-Disclosure Agreement did not require MiniMed to perform any act as a condition precedent to Nova's performance.

(3)    **Nova failed to do something that the contract required it to do, or did something that the contract prohibited it from doing.**

Nova contends that the Mutual Non-Disclosure Agreement was not breached because Nova did not launch the Nova Max Link™ meter until January 2008, after the purported expiration of the five-year confidentiality provision. This argument completely ignores the separateness of two independent contractual provisions, wherein the limited confidentiality provision is completely distinct from the perpetual restriction on the parties' ***use***. Paragraph 1 of the Agreement provides:

> For a period of five (5) years from date of receipt of such Confidential Information, the receiving party shall use reasonable efforts to prevent the disclosure to any other person, firm or corporation of such Confidential Information relating to the Subject which it receives from the disclosing party, ***except as provided below***, and shall use the same degree of care to protect the Confidential Information from unauthorized disclosure or risk of loss (such as fire or theft) as it employs with respect to its own proprietary and confidential information of like importance to it.

(emphasis added). In contrast, paragraph 5 provides:

32

This Agreement **shall not be construed as granting or conferring any rights, by license or otherwise**, expressly, impliedly or otherwise, with respect to such Confidential Information or to any invention, discovery or improvement made, conceived or acquired prior to or after the date of this Agreement. **Receiving party shall not make use of the Confidential Information for its own benefit without the prior written consent of disclosing party**.

(emphases added). Given the absence of any time limitation on the use restriction in paragraph 5, these two provisions must be construed independently. This interpretation is supported by the "except as provided below" language in paragraph 1, indicating that the time limitation on confidentiality is not intended to apply to other restraints on the parties elsewhere in the agreement. There is also no evidence that Nova intended to tether paragraph 5 to the five-year limitation in paragraph 1. Indeed, Nova's President will testify that he did not even review the Mutual Non-Disclosure Agreement until after this litigation commenced.

The Mutual Non-Disclosure Agreement clearly indicates that MiniMed did not intend to grant Nova any rights to the Communication Technology or to any other confidential information provided to Nova for the purpose of manufacturing the Paradigm Link®. This is reinforced in paragraph 4, which required Nova to promptly return or destroy MiniMed's documents and materials, as well as any work product derived therefrom, upon request.

Nova's conduct supports this reading. In fact, it was Nova that initially requested a nondisclosure agreement, so as to protect the confidential information that *Nova* had disclosed to MiniMed during the course of Project Crusader. Nova still considers that information to be confidential and proprietary, as evidenced by the fact that Nova has not disclosed it. In short, the language of the contract, the conduct of the parties, and the entire set of agreements supporting the transactions between MiniMed, BD, and Nova, demonstrate that both MiniMed and Nova intended to prohibit the party receiving confidential information from exploiting that information for its own benefit.

33

The Mutual Nondisclosure Agreement, which both parties signed, was dated effective as of September 27, 2002.  Both parties agreed that the Mutual Non-Disclosure Agreement should be dated to cover the first disclosure of confidential information, which occurred on or shortly before September 24, 2002.  In any event, MiniMed provided Nova with detailed software and hardware specifications, which were necessary to enable the meter to wirelessly communicate with MiniMed's insulin pumps, after September 27, 2002.  MiniMed continued to provide Nova with information and assistance relating to the development of the Paradigm Link® meter up until the meter's launch in July 2003.

Nova never obtained MiniMed's consent to use MiniMed's Confidential Information to build any meter other than the Paradigm Link®.  Nova thus breached the use restriction in the Mutual Non-Disclosure Agreement when it extracted the Communication Technology from the Paradigm Link® and inserted it into the Nova Max Link™.  The evidence will also demonstrate that Nova used MiniMed's Confidential Information to develop the Nova Max Link™ meter as early as April 2007—well before any purported expiration of the confidentiality period.  Finally, Nova has breached the Mutual Non-Disclosure Agreement by refusing to return MiniMed's documents, materials, and any work product derived from them.

### (4)    MiniMed was harmed by that failure or Nova was unjustly enriched by its breach.

Nova was unjustly enriched from its unauthorized use of MiniMed's Confidential Information.  Not only was Nova able to avoid the costs of having to develop its own communication technology, Nova was able to avoid the time necessary to develop a reliable and independently FDA-cleared device, enabling it to beat the OneTouch® UltraLink™ meter to market.  Nova obtained unjust profits from the sale of Nova Max Link™ meters and associated test strips.  In addition, Nova's breach of the Mutual Non-Disclosure Agreement caused a diminution in value of MiniMed's trade secrets in the amount of approximately $2.5 million to $13.8 million.

34

     iv.    **Claim 4:  Intentional Interference with Prospective Economic Advantage**

          (1)    **MiniMed was in an economic relationship with LifeScan that probably would have resulted in an economic benefit to MiniMed.**

In August 2007, MiniMed entered into an exclusive alliance with LifeScan to develop and distribute a new communicating meter in the United States.  MiniMed and LifeScan announced the alliance on August 21, 2007.

          (2)    **Nova knew of MiniMed's relationship with LifeScan.**

The announcement was reported two days later, on August 23, 2007, on the Nova News Page, which was sent to Nova's CEO, Frank Manganaro, and other Nova officers.  The News Page explained:  "LifeScan's new meter will **replace the Paradigm Link blood glucose monitor**, which is being discontinued by Becton Dickinson."  (emphasis in original).  Consistent with the Termination Agreement with BD, MiniMed assigned serial numbers above 600,000 to LifeScan for use in the new meter, the OneTouch® UltraLink™.

          (3)    **Nova intended to disrupt the relationship.**

Nova launched the Nova Max Link™ meter in January 2008, and this lawsuit was filed in February 2008.  On April 11, 2008, Mr. Manganaro sent a letter to Tom West, the President of LifeScan, North America.  In the letter, Mr. Manganaro noted that MiniMed had indicated in its papers to the Court that LifeScan would utilize serial numbers 600,000 and above.  Mr. Manganaro stated that Nova had "already distributed and continues to distribute Link meters with serial numbers in excess of 599,999."  Instead of identifying the numbers or ranges that had already been used, however, Mr. Manganaro asked that LifeScan use an alternative serial number scheme and provide additional information so that Nova could determine whether FDA notification might be required.

In his reply letter dated April 23, Mr. West informed Mr. Manganaro that "[t]he specifications for the [OneTouch® UltraLink™] Meter, including both the requirement that the Meter employ the serial number system developed by MiniMed, and the specific serial numbers to be used with Meters supplied by LifeScan, were determined by MiniMed, based on its, and its patients' requirements."  Mr. West requested that Mr. Manganaro inform LifeScan "what serial numbers above 599,999 Nova Biomedical has used with Nova Max Link meters it has distributed in the United States, as well as the serial numbers of such meters which [Nova] anticipate[s] will distribute on a monthly basis over the next 12 months," so that LifeScan could evaluate the situation.

LifeScan forwarded the correspondence to MiniMed.  On April 25, MiniMed's President, Christopher O'Connell sent a letter to Mr. Manganaro, requesting that Nova inform MiniMed "specifically the range of serial numbers on Nova Max Link meters that have already been distributed or manufactured so that Medtronic may continue to ship Ultra Link® meters that do not have overlapping serial numbers."

Mr. Manganaro replied on May 1.  In the letter, Mr. Manganaro stated that Nova had already used "many" of the serial numbers through 999,999 "on meters now in the hands of patients."  The letter further stated:  "We understand from your letter that Medtronic has in its possession LifeScan meters that use serial numbers in the Nova serialization range, but that Medtronic has not distributed, and will not distribute, any such meters within the Nova serialization range.  We trust that Medtronic has taken steps to ensure that none of the LifeScan meters having serial numbers within the Nova serialization range make their way into the marketplace.  However, if our understanding is incorrect, please let me know immediately so that the issue may be brought to the attention of the FDA."

On May 14, Mr. O'Connell wrote a follow-up letter to Mr. Manganaro, attempting to reach an agreement with Nova to allocate the remaining numeric serial numbers.  MiniMed requested confirmation that Nova had not distributed Nova Max

36

Link™ meters with serial numbers in the 725,000-875,000 range.  Up to that date, Nova had not done so.

Beginning on or around May 20 (and continuing through June 9), Nova manufactured Nova Max Link™ meters using the following non-sequential ranges of serial numbers, contrary to its prior practice:  650,007-651,529; 700,001-701,525; 750,001-751,404; 825,001-826,325; 875,251-876,325; 900,501-901,820; 960,201-960,450; and 990,002-990,737.  The evidence at trial will show that Mr. Manganaro specifically instructed the head of Nova operations to alter the serial number production plan for the Nova Max Link™ so "that instead of using a strict numerical sequence, to be a bit more random and use numbers throughout the remaining, the remaining pool of serial numbers available to us."

On May 22, Mr. Manganaro sent Mr. O'Connell a letter, in which he represented that Nova had already "shipped significant numbers of meters containing serial numbers in the 700,000, 800,000 and 900,000 range."  Nova again threatened to notify the FDA if MiniMed shipped OneTouch® UltraLink™ meters utilizing numeric serial numbers.

### (4)    Nova engaged in wrongful conduct.

The evidence presented at trial will show that Nova had no right, title, or interest in or to the Paradigm Link®.  The Research and Development Agreement between BD and Nova specifically provided that Nova would not obtain any rights to the technology contributed by MiniMed or to any derivative thereof.  That agreement further provided that Nova would obtain no rights to exploit or commercialize the developed product.  John Simmons, the former Vice President for Diabetes Marketing at BD, will testify that the Paradigm Link® was MiniMed's product, which BD supplied under a contractual obligation to MiniMed, for distribution to MiniMed's installed base of insulin pump customers.

MiniMed was the creator of the unique six-digit serial number scheme.  MiniMed included the six-digit serial number into the communication protocol, so that

37

an insulin pump would only accept data from a device whose serial number had been pre-programmed into that pump. MiniMed first used this six-digit serial number scheme with the remote key fob controller, and continued using it with the Paradigm Link® meter. Because it is important that each meter is hard-coded with a unique, six-digit identifier, and because MiniMed wanted to save some serial numbers in case it entered into partnerships with other meter companies in the future, MiniMed assigned to BD specific and limited ranges of serial numbers that could be used with the Paradigm Link®. When MiniMed and BD terminated their contractual relationship in March 2007, BD agreed that no Paradigm Link® meter would be manufactured using any serial number higher than 599,999, so that MiniMed could use the numbers 600,000 and above in future communicating meters.

### (5)     The relationship was actually disrupted.

Approximately half of MiniMed's customers utilize insulin pumps that can only accept numeric serial numbers. Thus, Nova deliberately prevented MiniMed from shipping OneTouch® UltraLink™ meters to approximately half of its installed base.

### (6)     MiniMed was harmed, and Nova's wrongful conduct was a substantial factor in causing MiniMed's harm.

As a result of Nova's wrongful conduct, MiniMed and LifeScan were forced to rework OneTouch® UltraLink™ meters that had already been manufactured with numeric serial numbers. MiniMed was damaged in the amount of $500,000. Nova's conduct was malicious and fraudulent, justifying an award of punitive damages.

### v.     Affirmative Defense 1:  Unclean Hands

### (1)     Nova engaged in inequitable conduct, which relates to the matters in controversy.

Nova engaged in inequitable conduct that directly relates to the matters in controversy in its UCL counterclaim. First, with respect to the "unfair" business practices claim, the evidence will show that Nova had no right, title, or interest in or to the Paradigm Link®, including the serial number scheme used with that meter. Nova's

role was to manufacture Paradigm Link® according to MiniMed's product specifications, and to supply meters to BD so that BD could fulfill MiniMed's orders. Despite explicitly agreeing that it would not receive any rights to the Paradigm Link®, Nova took MiniMed's Communication Technology from the Paradigm Link® to create a copycat meter under its own brand name, and took over the serial number scheme that MiniMed had created for the Paradigm Link®.

As discussed above, MiniMed (and LifeScan) asked Nova for information about which serial numbers above 599,999 had been used in Nova Max Link™ meters distributed to end users, so that MiniMed could determine which OneTouch® UltraLink™ meters it could send to customers. Nova responded by altering its production schedule to use random bunches of numbers covering the entire range, and then misrepresented to MiniMed that those meters had already been shipped. Nova thereby prevented MiniMed from sending the OneTouch® UltraLink™ meters to a significant portion of its installed base of insulin pump customers. It was not until this Court ordered Nova to disclose the serial numbers of the meters it had already distributed and allocate the remaining serial numbers that MiniMed was finally able to offer the OneTouch® UltraLink™ meter to those customers.

As for Nova's "fraudulent" business practices claim, Nova admitted in its Amended Answer that it advertised the Nova Max Link™ on websites with the domain names, www.paradigmlinkmonitor.com and www.paradigmlinkmeter.com. MiniMed owns federally registered trademarks for Paradigm® and Paradigm Link®. MiniMed has used the Paradigm® mark on its insulin pumps since at least June 1996, when the Paradigm® Model 507 pump was introduced. MiniMed has used the Paradigm Link® mark since at least July 2003, when the Paradigm Link® meter first became available to consumers. MiniMed never authorized Nova to use the Paradigm® or Paradigm Link® marks to promote the Nova Max Link™.

In addition to using domain names incorporating MiniMed's marks, Nova advertised the Nova Max Link™ as an "upgrade" to the Paradigm Link®, with the

1    same "proven technology."  Given that the Paradigm Link® meter was branded as a

2    MiniMed/BD product, and was exclusively distributed by MiniMed, such

3    advertisements were likely to mislead customers into believing that MiniMed

4    approved, supported, or was otherwise associated with the Nova Max Link™.  In fact,

5    consumers called MiniMed's customer service center asking for assistance with the

6    Nova Max Link™.  To clear up the confusion that Nova had created, MiniMed

7    accurately informed customers that the Nova Max Link™ was not a MiniMed product,

8    that MiniMed had not tested or validated it, and that MiniMed did not support the

9    meter.

10                    **(2)    It would be inequitable to grant Nova any relief.**

11         Nova seeks "unjust enrichment damages" for MiniMed's alleged "fraudulent"

12    business practices.  The UCL does not permit non-restitutionary disgorgement of

13    profits.  The remedy Nova seeks is not restitutionary because Nova does not have any

14    "ownership interest" in the money it seeks to recover from MiniMed.  Furthermore,

15    Nova has not articulated how it was harmed, or what damages it has incurred, as a

16    result of MiniMed's alleged false advertising or "attempted distribution of the

17    remaining numeric serial numbers to be used with wireless meters constitutes a

18    significant threat or harm to competition."  Order Granting in Part and Denying in Part

19    Pls. and Counterdefs.' Mot. for Summary Judgment on Counterclaims ("July 16, 2009

20    Order") [D.I. 469] at 12.

21         Assuming *arguendo* that the remedy that Nova seeks is permissible under the

22    UCL, which it is not, it would be inequitable to grant Nova any relief, as Nova has

23    engaged in inequitable conduct that directly relates to the matters in controversy.

24

25    **NOVA'S COUNTERCLAIMS AND AFFIRMATIVE DEFENSES**

26

27

28

                                            40

1    **(a)    Nova plans to pursue the following counterclaims and affirmative**

2          **defenses:**

3    <u>Counterclaim 1:</u>  MiniMed engaged in unfair or fraudulent business practices, in

4    violation of California's UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq.*

5    <u>Affirmative Defense 1:</u>  MiniMed's claims for misappropriation of trade secrets,

6    conversion, and intentional interference with prospective economic advantage are

7    barred by the doctrine of unclean hands.

8    **(b)    The elements required to establish Nova's counterclaim and**

9          **affirmative defense are:**

10         **i.    Counterclaim 1:  Unfair or Fraudulent Business Practices in**

11               **Violation of the UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq.***

12   California Business & Professions Code § 17200 defines unfair competition as

13   "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive,

14   untrue or misleading advertising and any act prohibited by" §§ 17500 to 17594.

15   **<u>Nova's Contentions:</u>**

16   Nova's claim is brought under the "unfair" and "fraudulent" prongs.  The

17   elements required to establish Nova's counterclaim under the UCL are:  (1) MiniMed

18   engaged in an "unfair" or "fraudulent" business practice; (2) MiniMed's "unfair" or

19   "fraudulent" business practice caused Nova to be harmed or MiniMed to be unjustly

20   enriched.  Cal. Bus. & Prof. Code § 17200.

21   The "fraudulent" prong includes "not only advertising which is false, but also

22   advertising which[,] although true, is either actually misleading or which has a

23   capacity, likelihood or tendency to deceive or confuse the public."  *Kasky v. Nike, Inc.*,

24   27 Cal. 4th 939, 951 (2002).  "[T]he word 'unfair' in [section 17200] means conduct

25   that "threatens an incipient violation of an antitrust law, or violate[d] the policy or

26   spirit of one of those laws because its effects are comparable to or the same as a

27   violation of the law, or otherwise significantly threatens or harms competition."  *Cel-*

28   *Tech Commc's, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).

Nova's "unfair" business practices claim is not limited to MiniMed's unfair attempt to corner the market on communicating meters by allocating to itself all remaining number serial numbers. MiniMed's contention to that effect is based on the mistaken premise that, in its Opposition to Plaintiffs' Motion for Summary Judgment, Nova was obligated to and did include *all* of its evidence in support of its unfair competition claim, rather than simply *enough* evidence to raise a genuine issue of material fact. *Cf.* Fed. R. Civ. P. 56(e)(2) (stating that, in order to defeat a motion for summary judgment, the nonmoving party need only "set out specific facts showing *a* genuine issue for trial") (emphasis added). Nova will present additional evidence at trial in support of its unfair competition claim, including MiniMed's own documents in which MiniMed admits that it "drives" LifeScan's compensation plan. In addition, LifeScan's compensation plan will show that it was specifically designed to corner the market on communicating meters and force Nova out of the communicating meter market.

**MiniMed's Contentions:**

The elements required to establish Nova's counterclaim under the UCL are: (1) MiniMed engaged in an "unfair" or "fraudulent" business practice; (2) MiniMed's "unfair" or "fraudulent" business practice caused Nova to lose money or property. Cal. Bus. & Prof. Code § 17200; *see Hall v. Time Inc.*, 158 Cal. App. 4th 847, 849 (2008). The UCL does not permit the recovery of non-restitutionary disgorgement of profits. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150-51 (2003).

In its Order Granting in Part and Denying in Part Plaintiffs and Counterdefendants' Motion for Summary Judgment on Counterclaims, the Court concluded that Nova had failed to cite any "antitrust law the text or spirit of which MiniMed allegedly violated," had failed to cite any "authority to support the proposition that MiniMed's alleged breach of contract significantly harms or threatens competition itself, not just [its] competitors," and had also failed to raise a triable issue

42

of fact as to "MiniMed's alleged statements to customers that it would not honor the warranty on any pump used with a Nova Max Link® meter." July 16, 2009 Order [D.I. 469] at 12. Based on the Court's July 16, 2009 Order, Nova's "unfair" business practices claim is limited to one issue—whether MiniMed's alleged "attempted distribution of the remaining numeric serial numbers to be used with wireless meters constitutes a significant threat or harm to competition." *Id.*

To establish that MiniMed's advertising was "fraudulent," Nova must "prove that [MiniMed's] statements are misleading to a reasonable consumer." *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1182 n.8 (9th Cir. 2003). Anecdotal evidence is insufficient to prove that the public is likely to be misled, and that "plaintiff must demonstrate by extrinsic evidence, such as customer survey evidence, that the challenged statements tend to mislead customers." *Id.*; *see* July 16, 2009 Order [D.I. 469] at 11 ("'[A]necdotal evidence alone is insufficient to prove that the public is likely to be misled.'" (quoting *Heighley v. J.C. Penney Life Ins. Co.*, 257 F. Supp. 2d 1241, 1260 (C.D. Cal. 2003)).

### ii.    Affirmative Defense 1:  Unclean Hands

The elements required to establish Nova's affirmative defense of unclean hands are:

(1)    MiniMed engaged in inequitable conduct;

(2)    The conduct relates to the matter in controversy; and

(3)    It would be inequitable to grant MiniMed any relief.

*See Dickson, Carlson & Campillo v. Pole*, 83 Cal. App. 4th 436, 446-47 (2000).

      (c)     **In brief, the key evidence Nova relies on for each counterclaim and affirmative defense is:**

          i.     **Counterclaim 1:  Unfair or Fraudulent Business Practices in Violation of the UCL**

              (1)     **MiniMed engaged in an "unfair" or "fraudulent" business practice.**

Nova will introduce evidence showing that Medtronic has engaged in false and misleading advertising and promotion with respect to the Nova Max Link® and OneTouch® UltraLink meters, causing significant customer confusion.  Documents and testimony show that Medtronic sent OneTouch® UltraLink meters to every user of the Nova-manufactured Paradigm Link® meters; contacted Paradigm Link® and Nova Max Link® customers through phone, mail, and the internet to encourage them to switch; and launched a scorched-earth marketing campaign with the false message that the Nova Max Link® did not work and was not approved by the FDA.  As Plaintiff's Rule 30(b)(6) designee, Mr. Gregory Meehan, admitted, if the technical functionality of the Nova Max Link® is the same as the Paradigm Link® (which it is), MiniMed's advertising is false.

Medtronic has produced call logs, customer service call scripts, customer marketing materials, and corporate policy statements containing the message that the Nova Max Link® lacks government authorization to be on the market, even though the Nova Max Link® is marketed under the same FDA clearance as the Paradigm Link® meter.  In addition, the evidence will demonstrate that Medtronic intentionally gave patients and health care providers the false impression that communicating meter users *had* to switch to the OneTouch® UltraLink meter, thereby attempting to secure 100% of the communicating meter market for itself, through misleading means.  Medtronic propagated that false impression while knowing, and recognizing in internal documents, that customers wanted a choice and access to leading technology when it came to BGMs.

In addition, Medtronic has engaged in activities designed to put Nova out of business with respect to communicating BGMs. For example, Medtronic worked closely and in concert with LifeScan in switching customers of Nova products to the OneTouch® UltraLink and associated test strips, even going so far as to submit summaries of Medtronic's switching successes to LifeScan. Furthermore, Nova will introduce evidence that LifeScan's compensation plan, which was driven by Medtronic, contained bonus incentives specifically for switching Nova meter users to LifeScan's products. Finally, the evidence will show that Medtronic attempted to allocate to itself all remaining numeric serial numbers for communicating BGMs to prevent Nova from manufacturing *any* additional communicating BGMs, and interfere with Nova's ability to supply warranty replacement meters.

### (2) MiniMed's "unfair" or "fraudulent" business practice caused Nova to be harmed or MiniMed to be unjustly enriched.

Nova will introduce evidence showing that Medtronic's actions had a detrimental impact on Nova's business, causing a drastic decline in Nova's sale of Nova Max® test strips, and caused Medtronic to be unjustly enriched at Nova's expense. Nova will also introduce documents and testimony that demonstrates the benefits of, and consumer preference for, Nova-manufactured meters and test strips.

### ii. Affirmative Defense 1: Unclean Hands

### (1) MiniMed engaged in inequitable conduct, which relates to the matter in controversy.

Nova will introduce evidence showing that Medtronic led Nova to believe that Medtronic was moving to an open architecture with respect to communicating meters, and did not reveal its intentions about entering into an exclusive relationship with LifeScan with the goal of switching all Paradigm Link® users to the OneTouch® UltraLink until after Nova, through Sanvita, provided Medtronic with Paradigm Link® meters at a steep discount. In fact, Medtronic assured Sanvita that it would not attempt

to switch the Paradigm Link® customer base.  Nova will also introduce evidence that Plaintiffs made materially false and misleading statements to this Court when it sought a Preliminary Injunction in this case about the alleged trade secrets and Medtronic's plan to move to an open architecture.  Moreover, Nova will show that Plaintiff brought this suit without undertaking an adequate pre-suit investigation to determine the merits of its asserted claims, including whether its technology was entitled to trade secret protection, and whether Nova has misappropriated the alleged trade secrets.  In addition, Nova will introduce evidence of Medtronic's misleading and false advertising, and its efforts to force its only competitor, Nova, off the market .   Finally, Nova will show that Medtronic has sought to hide – and has hidden – evidence that it has tried and is trying to patent its alleged trade secrets, as well as evidence that it reverse engineered the alleged trade secret technology allegedly embodied in the Nova Max Link® meter.

### (2)    It would be inequitable to grant MiniMed any relief.

MiniMed comes to this Court seeking to deprive Nova of its rightfully earned profits from the sale of products it is entitled to sell.  MiniMed does not allege the loss of a single strip sale resulting from Nova's conduct but rather seeks a windfall gain and to force Nova off the market.  In its pursuit of court-ordered elimination of competition, MiniMed has both acted unlawfully in the marketplace and improperly in this litigation.  It would be inequitable to grant MiniMed any relief in light of its own wrongful conduct.

## 8.    ISSUES THAT REMAIN TO BE TRIED

In view of the admitted facts and the elements required to establish the claims, counterclaims and affirmative defenses, the following issues remain to be tried:

### PLAINTIFF'S CLAIMS AND AFFIRMATIVE DEFENSE

### i.    Claim 1:  Misappropriation of Trade Secrets

The ultimate facts required to be proven for MiniMed's claim of misappropriation of trade secrets are:

(1)    MiniMed owned the Communication Technology;

(2)    The Communication Technology was a trade secret at the time of the misappropriation;

(3)    Nova improperly used the Communication Technology;

(4)    MiniMed was harmed or Nova was unjustly enriched; and

(5)    Nova's use of the Communication Technology was a substantial factor in causing MiniMed's harm or Nova to be unjustly enriched.

The Court must rule on the following legal issue:

(1)    Whether MiniMed should be granted injunctive relief.

The parties have presented and briefed additional legal issues relating to this claim in their respective Motions *in Limine* and Memoranda of Contentions of Fact and Law.

### ii.    Claim 2:  Conversion

The ultimate facts required to be proven for MiniMed's claim of conversion are:

**MiniMed's Contentions:**

(1)    MiniMed owned, possessed, or had a right to possession of information contained in documents and materials that MiniMed provided to Nova for the sole purpose of manufacturing the Paradigm Link®;

(2)    Nova intentionally took possession of that property by a wrongful act;

(3)    MiniMed did not consent;

(4)    MiniMed was harmed; and

(5)    Nova's conduct was a substantial factor in causing MiniMed's harm.

**Nova's Contentions:**

(1)    MiniMed owned the alleged trade secret communication technology;

(2)    Nova intentionally took possession of that property by a wrongful act;

47

(3)    MiniMed did not consent;

(4)    MiniMed was harmed; and

(5)    Nova's conduct was a substantial factor in causing MiniMed's harm.

The parties have presented and briefed legal issues relating to this claim in their respective Motions *in Limine* and Memoranda of Contentions of Fact and Law.

### iii.    Claim 3:  Breach of Contract

The ultimate facts required to be proven for MiniMed's claim of breach of contract are:

(1)    Nova failed to do something that the contract required it to do, or did something that the contract prohibited it from doing; and

(2)    MiniMed was harmed by that failure or Nova was unjustly enriched by its breach.

The Court must rule on the following legal issue:

(1)    The meaning and legal effect of the contract, unless the interpretation turns upon the credibility of extrinsic evidence.

*See Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865 (1965).

The parties have presented and briefed legal issues relating to this claim in their respective Motions *in Limine* and Memoranda of Contentions of Fact and Law.

### iv.    Claim 4:  Intentional Interference with Prospective Economic Advantage

The ultimate facts required to be proven for MiniMed's claim for intentional interference with prospective economic advantage are:

(1)    Nova intended to disrupt the relationship;

(2)    Nova engaged in wrongful conduct, specifically, in addition to misappropriating MiniMed's trade secrets and using confidential information, by manufacturing and distributing Nova Max Link™ meters using serial numbers to which it had no rights;

(3)    The relationship was actually disrupted;

48

(4)    MiniMed was harmed; and

(5)    Nova's wrongful conduct was a substantial factor in causing MiniMed's harm.

The parties have presented and briefed legal issues relating to this claim in their respective Motions *in Limine* and Memoranda of Contentions of Fact and Law.

### v.    Affirmative Defense 1:  Unclean Hands

The ultimate facts required to be proven for MiniMed's affirmative defense of unclean hands to Nova's UCL claim are:

(1)    Nova engaged in inequitable conduct; and

(2)    The conduct relates to the matter in controversy.

The Court must rule on the following the legal issue:

(1)    Whether it would be inequitable to grant Nova any relief.

*See Dickson, Carlson & Campillo v. Pole*, 83 Cal.App.4th 436, 447 (2000) ("The decision of whether to apply the defense based on the facts is a matter within the trial court's discretion.").

The parties have presented and briefed additional legal issues relating to this defense in their respective Motions *in Limine* and Memoranda of Contentions of Fact and Law.


### NOVA'S COUNTERCLAIM AND AFFIRMATIVE DEFENSE

#### i.    Counterclaim 1:  Unfair or Fraudulent Business Practices in Violation of the UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq.*

##### (1)    Unfair Business Practices Claim

The ultimate facts required to be proven for Nova's counterclaim for unfair business practices under the UCL are:

#### Nova's Contentions:

(1)    MiniMed's conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects

are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition;

(2)    MiniMed's conduct caused Nova to be harmed or MiniMed to be unjustly enriched.

**MiniMed's Contentions:**

(1)    MiniMed's attempted distribution of the remaining numeric serial numbers to be used with wireless meters constituted a significant threat or harm to competition;

(2)    MiniMed's conduct caused Nova to lose money or property.

The Court must rule on the following legal issue:

(1)    Whether Nova should be granted equitable relief.

The parties have presented and briefed additional legal issues relating to this claim in their Motions *in Limine* and Memoranda of Contentions of Fact and Law.

### (2)    Fraudulent Business Practices Claim

The ultimate facts required to be proven for Nova's counterclaim for fraudulent business practices under the UCL are:

**Nova's Contentions:**

(1)    MiniMed engaged in advertising that was false, actually misleading or which had a capacity, likelihood or tendency to deceive or confuse the public; and

(2)    MiniMed's conduct caused Nova to be harmed or MiniMed to be unjustly enriched.

**MiniMed's Contentions:**

(1)    MiniMed engaged in advertising that was likely to mislead the public; and

(2)    That advertising caused Nova to lose money or property.

The Court must rule on the following legal issue:

(1)     Whether Nova should be granted equitable relief.

The parties have presented and briefed additional legal issues relating to this claim in their Motions *in Limine* and Memoranda of Contentions of Fact and Law.

### ii.     Affirmative Defense 1:  Unclean Hands

The ultimate facts required to be proven for Nova's affirmative defense of unclean hands are:

(1)     MiniMed engaged in inequitable conduct; and

(2)     The conduct relates to the matter in controversy.

The Court must rule on the following the legal issue:

**MiniMed's Contentions:**

(1)     Whether it would be inequitable to grant MiniMed any relief.

*See Dickson, Carlson & Campillo v. Pole*, 83 Cal. App. 4th 436, 447 (2000) ("The decision of whether to apply the defense based on the facts is a matter within the trial court's discretion."); *A-C Co. v. Security Pac. Nat'l Bank*, 173 Cal. App. 3d 462, 474 (1985) ("It is equally beyond dispute that while a jury may be used for advisory verdicts as to questions of fact, it is the duty of the trial court to make its own independent findings and to adopt or reject the findings of the jury as it deems proper. There is no authority for asking a jury's advice as to . . . whether the equitable doctrines of promissory estoppel or unclean hands should be applied." (citations omitted)).

**Nova's Contentions:**

The jury can, and in this case should, decide whether MiniMed's claims for misappropriation of trade secrets, conversion, and intentional interference with prospective economic advantage are barred by the MiniMed's unclean hands. *Unilogic*, 10 Cal. App. 4th at 622-23 (holding that trial court did not err in submitting unclean hands defense to the jury; "[T]he trial court has discretion whether to submit an equitable defense to the jury.").

51

The parties have presented and briefed additional legal issues relating to this defense in their Motions *in Limine* and Memoranda of Contentions of Fact and Law.

## 9.    DISCOVERY

### MiniMed's Contentions:

All discovery is complete.  MiniMed's position is that it has complied with all discovery obligations.  MiniMed's responses to the issues raised in Nova's first, third, and fourth bullet points below are set forth in MiniMed's Oppositions to Nova's Motions *in Limine* Nos. 1, 5, and 12, and MiniMed's Amended Memorandum of Contentions of Fact and Law.  MiniMed disputes the allegations in the second and fifth bullet point, and notes that Nova has fundamentally changed the nature and scope of its UCL claim and unclean hands defense.  MiniMed will brief these issues further in its Trial Brief.

### Nova's Contentions:

MiniMed failed in numerous of its fact and expert discovery obligations, including:

- • Failure to properly identify its alleged trade secrets;
- • Failure to provide proper notice of the allegations it will pursue at trial;
- • Failure to produce highly relevant documents, including published patent applications that disclose MiniMed's alleged trade secrets;
- • Failure to properly disclose the opinions of its retained experts;
- • Fundamentally changing the nature of its conversion and intentional interference claims such that they are now substantially different from the allegations contained in the pleadings and in MiniMed's responses to Nova's interrogatories.

Nova has sought or will seek appropriate relief from the Court.  *See*, *e.g.*, Nova's Motions In Limine Nos. 1, 5 and 12, Nova's Amended Memorandum of Facts and Law and Nova's Trial Brief.

**10.    EXHIBITS**

All disclosures under F.R.Civ.P. 26(a)(3) have been made.

The amended joint exhibit list of the parties was filed under separate cover on July 27, 2009, as required by L.R. 16-6.1.  Per the Court's order at the Pretrial Conference, the parties are concurrently filing an Amended Joint Pretrial Exhibit Stipulation.  Unless all parties agree that an exhibit shall be withdrawn, all exhibits will be admitted without objection at trial, except those exhibits listed below:

MiniMed objects to Exhibit Nos. 84, 144, 145, 150, 202, 238, 269, 271, 420, 422, 501, 502, 503, 521, 530, 542, 1091, 1095, 1104, 1153, 1155, 1186, 1197, 1293, 1478, 1479, 1480, 1481, 1482, 1483, 1493, 1496, 1498, 1499, 1500, 1501, 1502, 1504, 1505, 1512, 1515, 1516, 1517, 1520, 1521, 1522, 1523, 1524, 1525, 1526, 1527, 1528, 1529, 1530, 1531, 1532, 1533, 1534, 1535, 1536, 1537, 1538, 1539, 1540, 1541. MiniMed's objections, and grounds for each objection, are set forth in Appendix A.

Nova objects to Exhibit Nos. 7, 42, 43, 44, 45, 68, 79, 81, 93, 94, 95, 97, 285, 342, 349, 350, 356, 366, 367, 379, 384, 385, 388, 410, 412, 413, 527, 545, 700, 706, 707, 708, 709, 722, 723, 725, 726, 729, 739, 747, 759, 760, 761, 762, 765, 766, 768, 769, 770, 771, 773, 780, 789, 790, 791, 797, 805, 824, 885, 894, 895, 896, 903, 909, 910, 911, 912, 1022, 1023.  Nova's objections, and grounds for each objection, are set forth in Appendix B.

**11.    WITNESSES**

Amended witness lists of the parties were filed with the Court on July 27, 2009.

Only the witnesses identified in the lists will be permitted to testify (other than solely for impeachment).

Each party intending to present evidence by way of deposition testimony has marked such depositions in accordance with L.R. 16-2.7.  For this purpose, the following depositions shall be lodged with the Clerk as required by L.R. 32-1:

1     •    Videotaped Deposition of Jennifer Andrews, May 22, 2009

2     •    Videotaped Deposition of Michael Geldart, May 21, 2009

3     •    Videotaped Deposition of Michael S. Iskra, May 19, 2009

4     •    Videotaped Deposition of Paul William MacDonald, April 29, 2009

5     •    Videotaped Deposition of Francis C. Manganaro, May 8, 2009

6     •    Videotaped Deposition of Scott Alan Rodriques, April 28, 2009

7     •    Videotaped Deposition of James Stephenson Sidwell, May 7, 2009

8     •    Videotaped Deposition of John Simmons, May 29, 2009

9     •    Videotaped Deposition of Joseph Capper, May 15, 2009

10     •    Videotaped Deposition of Laura Egan, May 8, 2009

11     •    Videotaped Deposition of Eric P. Geismar, April 16, 2009

12     •    Videotaped Deposition of Gregory A. Meehan, April 17, 2009

13     •    Videotaped Deposition of Sheldon Moberg, May 6, 2009

14     •    Videotaped Deposition of T. Cole Peterson, May 13, 2009

15     •    Videotaped Deposition of Stephen Saft, April 16, 2009

16     •    Videotaped Deposition of Trent Scheriger, June 2, 2009

17     •    Videotaped Deposition of Cary Talbot, May 7, 2009

18 **MiniMed's Objections:**

19       Several party representatives appear on both MiniMed's and Nova's respective

20 witness lists.  The parties have met and conferred regarding the order and presentation

21 of witnesses, but the parties disagree as to the procedure for examination of certain

22 party representatives that both sides intend to call as witnesses.  MiniMed believes that

23 the interests of judicial economy and the parties' resources would be best served by

24 calling such witnesses to the stand only once.  Nova's party representatives, however,

25 are domiciled outside of the range of the Court's subpoena power, and therefore

26 MiniMed cannot compel the attendance of these witnesses at trial.  Fed. R. Civ. P.

27 45(b)(2)(B).  Nova has refused to produce any Nova witnesses for live testimony

28

1   during MiniMed's case-in-chief, while reserving the right to call these same witnesses

2   for live testimony during Nova's case-in-chief.[5]

3       Nova offered two "compromise" proposals to address this issue.  First, Nova

4   offered to produce its party representatives during MiniMed's case-in-chief, but only

5   on the condition that Nova's counsel be permitted to examine Nova's own witnesses

6   first on direct examination in the midst of MiniMed's case.  Alternatively, Nova

7   offered to call its party witnesses in Nova's case-in-chief and permit MiniMed to

8   examine Nova's party witnesses outside the scope of their direct examinations, while

9   agreeing to defer any motion made pursuant to Fed. R. Civ. P. 50 until after MiniMed

10  has had the opportunity to examine any witness identified on MiniMed's witness list.

11  MiniMed declined to accept either proposal, as both of these alternatives would

12  unreasonably bind MiniMed to a mode and order of interrogating witnesses that would

13  substantially prejudice its ability to make its presentation effective for the

14  ascertainment of truth.  Fed. R. Evid. 611(a).

15      Absent Nova's voluntary production of its party representatives, MiniMed will

16  be forced to present deposition testimony of each of Nova's representatives during

17  MiniMed's case-in-chief.  Fed. R. Civ. P. 32(a)(3).  MiniMed is prepared to do so, but

18  believes that the presentation of videotaped deposition testimony from Nova's party

19  representatives, followed by Nova calling these same witnesses again for live

20  testimony during its own case-in-chief, would incur needless consumption of time and

21

22  _____

23  [5]  MiniMed, on the other hand, has agreed to voluntarily produce its witnesses again
    in Nova's case in chief, even though it believes that requiring its own party
    representatives to appear twice will needlessly extend the length of trial and waste
24  the resources of the parties and the Court.  Fed. R. Evid. 611(a).  MiniMed
25  respectfully submits that the most efficient presentation of testimony from party
    representatives that both parties intend to call would be to expand the scope of
26  cross-examination of such witnesses during MiniMed's case-in-chief and to permit
27  Nova to inquire into additional matters as if on direct examination.  Fed. R. Evid.
    611(b).
28

may potentially present cumulative evidence and confuse the jury.  Fed. R. Evid. 403, 611(a).  MiniMed thus requests that the Court exercise its discretion to preclude Nova from presenting live testimony from any party representative that Nova refuses to make available or bring within the subpoena range of the Court during MiniMed's case-in-chief, and balance the equities by requiring Nova to rely on deposition testimony from such party representatives that it refuses to produce for live testimony.  *See R.B. Matthews, Inc. v. Transamerica Transp. Servs., Inc.*, 945 F.2d 269, 272-73 (9th Cir. 1991) ("By denying [plaintiff's] requests to produce Reed and White as live witnesses, [defendant] engaged in gamesmanship, forcing [plaintiff] to rely on depositions.  The district court did not abuse its discretion when it forced [defendant] to rely on deposition testimony as well.").[6]

In addition, MiniMed objects to the presentation of testimony of the following witnesses:

- Laura Stamm (certain topics)
- John P. J. Kelly
- Joseph Capper (certain topics)
- Trent Scheriger

---

[6] Nova's quotation from *Parrish v. National Football League Players Inc.*, 2007 WL 1624601 (N.D. Cal. June 4, 2007) is incomplete and out of context, as that case considered the convenience of witnesses in deciding motion to transfer pursuant to 28 U.S.C. § 1404(a).  The *Parrish* court did *not* consider what Nova is proposing to do—which is to block its own party witnesses from appearing in Plaintiff's case, while calling those same witnesses in its own case.  Indeed, this is underscored by a complete quotation from *Parrish*:  "[D]efendant can likely secure the attendance of witnesses they wish to call at trial.  If these employees' testimony is not favorable to defendants, however, defendants are under no obligation to make them appear where they cannot be compelled to testify by the Court's subpoena power.  Plaintiffs could still present their testimony through deposition, *but live testimony is favored as it is easier to follow and to comprehend.*"  *Parrish*, 2007 WL 1624601, *7 (emphasis added).

- Greg Meehan (certain topics)
- Sheldon Moberg
- Robert Case
- Ty Lee

MiniMed's objections to the proposed testimony of these witnesses, and the grounds for each objection, are set forth in Appendix C.

**Nova's Objections:**

Nova agrees that the Court's and the parties' time will be used most efficiently if each witness takes the stand only once and the parties are permitted to ask questions outside the scope of the direct examination during cross examination for those witnesses that appear on both parties' witness lists.  In order to permit each witness to testify only once while at the same time minimizing jury confusion and preserving the parties' ability to present their evidence in an orderly and efficient manner, Nova proposes that it be permitted to examine MiniMed's party witnesses outside the scope of their direct examinations when they are called by MiniMed in MiniMed's case-in-chief.  Likewise, Nova will call its party witnesses in its case-in-chief and MiniMed will be permitted to examine Nova's party witnesses outside the scope of their direct examinations.  Subject to the Court's approval, Nova would wait to file any motion under Fed. R. Civ. P. 50 until after MiniMed has had the opportunity to examine any witness identified on MiniMed's witness list.  Nova believes that this proposal represents the most efficient way of presenting the evidence to the jury in a fair and non-confusing manner.  Nova's proposal reflects the fact that the scope of Nova's party witnesses' will most likely be much longer and more in depth when being examined by Nova's attorneys.  And likewise, the converse is true for MiniMed's party witnesses.  It, therefore, makes sense to allow each party to examine its own party witnesses first.

MiniMed has rejected this proposal and instead has proposed that it be entitled to call all witnesses on its witness list, including Nova's party witnesses, in its case-in-

57

chief with Nova being permitted to cross examine these witnesses beyond the scope of the direct examination.  This proposal effectively permits MiniMed to have the first opportunity to examine all of the key witnesses in this action, including Nova's party witnesses.  Nova believes that this scenario increases the likelihood of jury confusion because the scope of the "direct" testimony that MiniMed will most likely elicit will be narrower than the "cross" examination that will be conducted by Nova.  Furthermore, MiniMed's proposal is fundamentally unfair because Nova's party witnesses will be subject to hostile examination by MiniMed before Nova's witnesses will have had an opportunity to give their affirmative testimony, thereby prejudicing Nova's ability to present its defense in the customary manner and in manner that is most easily understood by the jury.  MiniMed's proposal also ignores the fact that Nova's witnesses are outside the scope of the Court's subpoena power and thus, under its proposal, MiniMed would have the opportunity to call live witnesses that they ordinarily would not have.  *See, e.g.*, *Parrish v. Nat'l League Players, Inc.*, 2007 WL 1624601, at *7 (N.D. Cal. June 4, 2007) ("[D]efendants are under no obligation to make [their employee witnesses] appear where they cannot be compelled to testify by the Court's subpoena power.")  Finally, MiniMed's request to have Nova precluded from bringing its party witness to testify in its own case-in-chief is misplaced.  As noted by the Ninth Circuit in the case cited by MiniMed, "[a]s a general matter, the actions of the trial court [in precluding the defendant from presenting live testimony] are troubling because, if made a practice, they could skew discovery.  Were depositions, for example, to be used to replace live testimony, both plaintiffs and defendants would be forced to elicit the planned testimony of their witnesses during depositions, thus disclosing at that time their entire trial strategy." *R.B. Matthews*, 945 F.2d at 272-273.

Should the Court be inclined to allow MiniMed to call Nova's party witnesses in its case-in-chief, Nova respectfully requests that Nova be permitted to examine its party witnesses first with MiniMed being permitted to examine Nova's party witnesses

outside the scope of the their direct examinations.  For the reasons stated above, Nova believes that permitting Nova to present its party witnesses to the jury first will minimize the chance of jury confusion.[7]

In addition, Nova objects to the presentation of testimony of the following witnesses:

- Jennifer Andrews
- R. Bruce Den Uyl
- Francis J. Doyle III
- Mark Faillace
- Michael Geldart
- Michael Iskra
- Michael Ortega
- John Simmons (certain topics)

Nova's objections to the proposed testimony of these witnesses, and the grounds for each objection, are set forth in Appendix D.

## 12.  MOTIONS

The following law and motion matters and motions in limine, and no others, are pending or contemplated:

**(a)  MiniMed's Motions**

- MiniMed's Motion *in Limine* No. 1 to Exclude the Expert Reports, Opinions, and Testimony of Laura B. Stamm (limited to portion relating to Nova's UCL counterclaim);

---

[7] Clearly Nova has not, as MiniMed claims, refused to produce any Nova witnesses during MiniMed's case-in-chief.  MiniMed's statement to the contrary misrepresents Nova's position.  Rather, Nova has set forth an alternative and superior proposal regarding the order of presentation that is both fair and economical.  MiniMed rejected Nova's proposal.

- MiniMed's Motion *in Limine* No. 2 to Exclude Any Evidence of Reverse Engineering, the Reverse Engineer, and the Expert Report and Testimony of Dr. John P. J. Kelly;

- MiniMed's Motion *in Limine* No. 3 to Exclude Reference to any Evidence of Defendants' Unfair Competition Law Claim Before the Jury; and

- MiniMed's Motion *in Limine* No. 6 to Exclude (1) Statements Made By Consumers to Defendants' Representatives, and (2) Statements Made By MiniMed Customer Service Representatives to MiniMed's Customers.

**(b)    Nova's Motions**

- Nova's Motion *in Limine* No. 1 to Exclude Plaintiffs' Evidence Regarding Their Alleged Trade Secrets for Attempting to Conduct Trial by Surprise;

- Nova's Motion *in Limine* No. 5 to Exclude Financial and Valuation Opinions of Dr. Francis J. Doyle III;

- Nova's Motion *in Limine* No. 7 to Exclude Irrelevant Testimony from Dr. Francis J. Doyle III Relating to Artificial Pancreas and GPS Technology;

- Nova's Motion *in Limine* No. 8 to Exclude Unreliable and Irrelevant Testimony and Expert Opinions from R. Bruce Den Uyl;

- Nova's Motion *in Limine* No. 9 to Exclude Testimony About Damages Estimates that Are Not Broken Out by Claims or Parties in This Action;

- Nova's Motion *in Limine* No. 10 to Exclude Plaintiffs from Presenting Evidence or Testimony About Future Damages or Anticipated Future Unjust Enrichment; and

- Nova's Motion *in Limine* No. 12 to Exclude Plaintiffs' Trade Secret Evidence for Failure to Provide Highly Probative Discovery.

13. **BIFURCATION**

Bifurcation of the following issues for trial is ordered:

**MiniMed's Contentions:**

1    MiniMed requests that the trial be bifurcated into two phases:  (1) trial by jury

2    on MiniMed's claims for legal damages; (2) bench trial on equitable issues, *i.e.*,

3    Nova's equitable defense of unclean hands, equitable relief on MiniMed's claims,

4    Nova's UCL counterclaim, and MiniMed's equitable defense of unclean hands.

5    Nova has no right to a jury trial on the equitable issues.  Furthermore, it is clear

6    from Nova's description of the key evidence in support of its unclean hands defense

7    that the issues of law and fact raised by Nova's unclean hands defense do not overlap

8    with the issues raised by MiniMed's claims.  If Nova were permitted to present

9    evidence and argue to the jury about MiniMed's alleged inequitable conduct (such as

10    alleged false advertising), there would be a serious danger of undue prejudice and

11    confusion, as the jury might be swayed into factoring this evidence into determining

12    Nova's liability on MiniMed's claims.  For this reason, this Court should bifurcate the

13    legal and equitable issues.  *See* Fed. R. Civ. P. 42; *see also Dollar Sys., Inc. v. Avcar*

14    *Leasing Sys., Inc.*, 890 F.2d 165, 170 (9th Cir. 1989) (holding that the district judge

15    acted within his authority in bifurcating the legal and equitable claims pursuant to Rule

16    42 and in trying equitable claims to the court.).

17    **<u>Nova's Contentions:</u>**

18    Nova requests that in the interests of judicial and party economy the trial on

19    liability and defenses to liability not be bifurcated.  The evidence relating to Nova's

20    affirmative defense, which substantially if not completely overlaps with the evidence

21    relating to Nova's defenses to MiniMed's claims, should be presented to the jury.

22    However, Nova respectfully requests that, should Plaintiff prevail on one or more of its

23    claims and should no injunction issue, the Court should hold a hearing at which time it

24    will determine the appropriate form and method of payment from Nova (*e.g.*, a

25    royalty), if any, going forward.  (*See* Defendants' Motion In Limine No. 10.)

26

27

28

**14.    CONCLUSION**

The foregoing admissions have been made by the parties, and the parties having specified the foregoing issues remaining to be litigated, this Final Pretrial Conference Order shall supersede the pleadings with respect to MiniMed's claims against Nova, and Nova's counterclaim against MiniMed, and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

IT IS SO ORDERED.

Dated: August 26, 2009

_____

UNITED STATES DISTRICT JUDGE

Approved as to form and content,

Dated:  August 25, 2009

GIBSON, DUNN & CRUTCHER LLP

By:  _____

Attorneys for Plaintiffs MEDTRONIC MINIMED, INC. and MINIMED DISTRIBUTION CORPORATION

Dated:  August 25, 2009

DYKEMA GOSSETT LLP
ROPES & GRAY LLP

By:  _____

Attorneys for Defendant NOVA BIOMEDICAL CORPORATION

Proposed Second Amended PTCO.DOC